# Illinois Official Reports

## Appellate Court

***People v. Saulsberry*, 2021 IL App (2d) 181027**

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. CHAVEZ K. SAULSBERRY, Defendant-Appellant. |
| District & No. | Second District<br>No. 2-18-1027 |
| Filed | September 23, 2021 |
| Modified upon denial of rehearing | October 7, 2021 |
| Decision Under Review | Appeal from the Circuit Court of Kane County, No. 09-CF-902; the Hon. James C. Hallock, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | James E. Chadd, Thomas A. Lilien, Steven L. Walker, and Christopher McCoy, of State Appellate Defender's Office, of Elgin, for appellant.<br><br>Jamie L. Mosser, State's Attorney, of St. Charles (Patrick Delfino, Edward R. Psenicka, and Katrina M. Kuhn, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |

JUSTICE BIRKETT delivered the judgment of the court, with opinion.
Presiding Justice Bridges and Justice Hudson concurred in the judgment and opinion.

## OPINION

¶ 1    Following a jury trial in the circuit court of Kane County, defendant, Chavez K. Saulsberry, was convicted of the first degree murder of Michael Moore (Michael) (720 ILCS 5/9-1(a)(2) (West 2004)) and the attempted first degree murder of Jamarain Tuggles (720 ILCS 5/8-4(a), 9-1(a)(1) (West 2004)), for which he received consecutive 25-year and 10-year terms of imprisonment. Defendant appeals aspects of the proceedings in the trial court, arguing that his trial counsel was ineffective, the trial court abused its discretion by admitting prejudicial hearsay testimony, the preceding two claims of error constituted cumulative and reversible error, and his posttrial counsel provided ineffective assistance. We affirm.

¶ 2                                I. BACKGROUND

¶ 3    We summarize the relevant facts appearing in the record on appeal. As an initial matter, we note that, on April 9, 2009, defendant was charged in the 2005 shooting of Michael and Tuggles. However, because of the number of defendants involved in the offenses, many of the attorneys available to serve as appointed counsel experienced conflicts that delayed the trial in this matter. On November 30, 2015, trial commenced.

¶ 4                    A. Incident at the Chicago Style Barber Shop

¶ 5    On November 25, 2005, Michael, a Gangster Disciples gang member also known as Lebeau, borrowed his girlfriend's car and drove Tuggles, also a Gangster Disciples gang member, to get a haircut at the Chicago Style Barber Shop in Aurora. During his testimony, Tuggles answered nearly every question posed with "I don't remember." The State introduced as substantive evidence Tuggles's May 2021 testimony from codefendant Ruben Hernandez's trial.[1] Tuggles testified that he observed four rival Latin Kings gang members enter the shop as he was receiving his haircut: Quentin Moore (Quentin),[2] Salvador Gonzalez, Hernandez, and defendant. The parties stipulated that the shop's owner identified another Latin Kings gang member, Max Aguilar, as being present during the barbershop incident and did not identify defendant as being present. Similarly, while testifying on defendant's behalf, Gonzalez did not include defendant in those who were present during the barbershop incident.

¶ 6    Tuggles testified that he engaged in a " '[l]ightweight argument' " with Quentin while receiving his haircut. Tuggles called Michael to pick him up and left the barbershop. The rival gang members also exited the barbershop. Tuggles challenged Quentin to "go to the back" and fight in the alley near the barbershop. Hernandez, however, displayed a handgun, and the owner told the group not to do that at his shop. Michael pulled up but, according to Tuggles, indicated

_____

[1]See *People v. Hernandez*, 2014 IL App (2d) 120947-U.
[2]Quentin is not related to Michael.

that he did not want Tuggles to get in the car over concerns that the rival gang members would be able to identify the car. Hernandez again displayed the handgun, and Tuggles jumped into the car and he and Michael drove off. The shop owner did not see a gun.

¶ 7                                    B. The Shooting

¶ 8        On November 28, 2005, Michael was shot to death after he and Tuggles had dropped off Cornelius Poole, Michael's cousin, at the parole office. Several witnesses gave accounts describing their roles or experiences.

¶ 9        Ezequiel Rivera testified that, on November 28, 2005, he was not yet a full member of the Latin Kings street gang, but was a "shorty."[3]  As such, he was required to follow the requests and orders of any higher-ranking persons in the gang, such as officers and full members (those who had received their crowns). Rivera testified that he borrowed his mother's minivan that day and personally checked in with the probation office. He received a call from a friend requesting a ride to work. When he arrived at the friend's house, he was approached by Augustine Montez, Hernandez, Aguilar, and defendant, all of whom were fully initiated members of the Latin Kings gang. Rivera testified that defendant was wearing a black coat with no shirt and he could see a crown tattoo on defendant's chest. Rivera testified that Montez told him to take him to Joel Zapata's house. Rivera protested that he had agreed to give his friend a ride to work, but Montez told him to forget it. Rivera testified that, because he was still a shorty, he felt that he had to follow Montez's instructions to avoid a violation.[4]

¶ 10       Rivera acquiesced and drove Montez, defendant, Hernandez, and Aguilar to Zapata's house. When they arrived at Zapata's house, Montez got out and spoke with Rudy Zapata (Joel's father). Rivera testified that the two men argued, after which Montez returned to the car. Rivera testified that, when Montez returned, he observed Montez carrying a black semiautomatic handgun. Montez handed the gun to defendant. Montez then told Rivera to drive to Gonzalez's house.

¶ 11       Rivera complied, and they picked up Gonzalez, who had been hanging out with his brother and Quentin. After picking up Gonzalez, the group went "hunting," meaning looking for rival gang members to shoot. Rivera testified that, while hunting, defendant recommended targeting a person he believed to be a rival gang member. Montez told defendant to stand down because that person was not a member of any gang. Rivera testified that Quentin then called Gonzalez and arranged to meet with them.

¶ 12       Rivera drove to the meeting place, and Gonzalez talked with Quentin. When Gonzalez returned to the van, he instructed Rivera to drive to the parole office because they were going to provide protection for Quentin as he checked in with the parole office. Rivera complied, and the group remained in Rivera's van as Quentin entered the parole office. While they waited, somebody in the van spotted a member of the rival Vice Lords street gang. Rivera testified that defendant and the others in the van "got to plotting" how to shoot the rival Vice Lords gang member.

_____

[3]"Shorty," in this parlance, means a Latin Kings gang member who has not been made a full member, or "given his crown."

[4]Witnesses testified that the penalties for violations ranged from physical beatings to death, depending on the severity of the infraction. Rivera testified that he believed that he would have been beaten if he had disobeyed Montez.

¶ 13 During the "plotting," a white car driven by Michael, with Tuggles and another passenger, pulled up to the parole office. The second passenger exited the white car. Rivera testified that Gonzalez said to the group in the van, "[t]here goes Lebeau," and instructed Rivera to follow the white car. Rivera testified that he could have refused Gonzalez's order but he would have been subject to a violation. Rivera also testified that he believed he would have been subject to a violation had he refused a request from defendant.

¶ 14 Rivera testified that he followed the white car along the street. The other gang members in the van were telling Rivera how to drive. They told him to keep up with the white car and not to draw attention to the van. Rivera testified that, as he was catching up to the white car, someone told him to get ready to turn. Rivera testified that, from behind him in the van, he heard the passenger-side sliding door open. Rivera testified that he glanced back and saw defendant holding the black semiautomatic handgun. Rivera testified that defendant was holding the weapon with both hands and was turned in his seat toward the white car, aiming the gun toward the white car. Rivera testified that he saw Hernandez, who was seated behind defendant, holding open the van's sliding door. Rivera testified that, as he closed with the white car, he heard multiple gunshots and was told to turn. As he completed the turn, Gonzalez exclaimed that Michael had been shot in the head.

¶ 15 Rivera testified that he drove to another gang member's house and dropped everyone off. Rivera then returned home and cleaned out the van. Rivera testified that, while cleaning, he found two empty shell casings, which he flushed down the toilet. Rivera testified that, at some time after the offense, he received his crown for his participation in Michael's murder.

¶ 16 Rivera also testified about significant concessions he received by cooperating with the State. Specifically, Rivera acknowledged that he would serve eight years in prison (pursuant to a 20-year sentence), which was significantly less than he would have faced had he not cooperated, and that, in exchange for his sentence, he provided testimony about the multiple murders in which he served as a driver and about other cases of which he had knowledge.

¶ 17 Tuggles testified that, on the morning of November 28, 2005, he checked in at the parole office. He then met Michael where Michael's girlfriend worked. Tuggles, Michael, and Poole returned to the parole office, where they dropped off Poole. Michael and Tuggles drove off after Poole got out of the car.

¶ 18 Tuggles testified that Michael was driving while Tuggles was sitting in the front passenger seat, leaning back, and talking on his cell phone. Tuggles testified that he heard between 15 and 20 gunshots from the driver's side of the car. Tuggles dropped his phone and shielded his head with his left arm. A few seconds after the gunshots, the car crashed into a small tree. Tuggles testified that he observed that Michael had been shot in his head, neck, and hand. Tuggles testified that he did not see who shot at them.

¶ 19 Tuggles testified that he climbed out of the front-passenger window. As he exited the car, he was stopped by a police officer. Tuggles did not realize that he, too, had been shot; it was not until years later that the bullet was removed from his left elbow.

¶ 20 Roman Lucio testified about events in which he participated occurring later in day of the shooting. First, however, Lucio testified that he was a former Latin Kings gang member and, beginning in 2007, he was cooperating with authorities in exchange for significant consideration. Lucio testified that he pleaded guilty to a federal drugs charge and two state murder charges. For the federal charge, Lucio was sentenced to serve a 20-year federal prison term of which he would be required to serve 85%, or 17 years. For the state murder charges,

he was sentenced to 26-year terms of which he would be required to serve 50%, or 13 years. Lucio testified that all the terms of imprisonment were to run concurrently and he was to serve them in a federal penitentiary.

¶ 21 Lucio testified that, on November 28, 2005, he was driving near the parole office and saw a white car "off the curb, kind of like crashed, and it was like a crime scene around it." Lucio learned that the crash happened after a shooting. Lucio went to the house of Rivera's friend and met Quentin. Lucio and Quentin went into a back room, and while alone in the room, they discussed the shooting. Lucio testified that, during his discussion with Quentin, defendant entered the room. Lucio testified that Quentin told him to shake defendant's hand because defendant was "the one that took care of it."[5] Lucio testified that he shook defendant's hand "like a Latin King," after which defendant pounded his chest.[6] Lucio testified that, by shaking defendant's hand in that manner, he was "giving [defendant] his respect."

¶ 22 Before defendant's case-in-chief, trial counsel informed the trial court that Jaroslaw Czapla, a potential occurrence witness, had not appeared pursuant to his subpoena. Trial counsel would instead attempt to have the police officer who took Czapla's statement testify about the substance of Czapla's statement. The trial court determined that the officer's testimony would be hearsay and refused to allow it.

¶ 23                                    C. Closing Argument
¶ 24 During the State's closing argument, the State laid out its theory of the case. The State emphasized that the evidence showed that defendant and the others in Rivera's vehicle were actively hunting for rival gang members to shoot. When they spotted Michael and Tuggles, they plotted how to accomplish their goal of shooting them. Rivera was instructed to catch up to Michael's vehicle, and the sliding door of Rivera's vehicle was held open to allow defendant to "have a precise unobstructed view into Michael Moore's vehicle." Defendant then "fired round after round into the vehicle of Michael Moore." The State noted that, "just like that on November 28th of 2005, this defendant took the life of Michael Moore." The State then reviewed the instructions the jury would receive in light of its theory of the case. The State concluded by asking the jury to find defendant guilty of the murder of Michael and the attempted murder of Tuggles.

¶ 25 One theme of defendant's closing argument was that the State solely relied on and uncritically accepted Rivera's story. Defendant argued that, "throughout the trial[, the State] never bothered to give you any corroborating evidence that what [Rivera] said was true." Elaborating, defendant argued that Rivera had no credibility because there were no witnesses to corroborate his testimony. Specifically, defendant argued that "[Rivera] talks about the co-defendants. I don't see any of them here. I don't think any of them were brought in as witnesses to testify." Defendant concluded his closing argument by continuing the credibility theme: "We think that you cannot find credibility in this evidence without considering all of the things that they did not provide you in the way of corroboration to support [Rivera's] testimony."

---

[5]Defendant objected to the testimony as hearsay, offered for the truth of the statement that defendant carried out the shooting. The testimony was admitted over objection.

[6]There was other testimony that only a full member of the Latin Kings gang was allowed to pound his chest after giving the gang handshake.

¶ 26    A second theme running through defendant's closing argument was that he simply was not present in the van when the shooting occurred. Because he was not present, he was a patsy for the cooperating witnesses to blame. This also had the advantage of minimizing any repercussions because defendant was not a high-ranking gang member like Quentin. Defendant argued that Rivera's testimony that defendant was in the van was untrue, so he would be "additional collateral damage" if the jury believed Rivera's testimony. In defendant's estimation, the police uncritically accepted Rivera's version of the shooting when Rivera finally stepped forward, and the only physical evidence possessed by the police amounted to spent shell casings, but they "didn't have a gun." In addition, the only independent witness was a police officer who heard the shots while he happened to be on a nearby street and observed Michael's car collide with a tree. With this lack-of-gun theme, defendant concluded by emphasizing the "lack of forensic or corroborating evidence."

¶ 27    In the State's rebuttal closing argument, the State argued that the various accounts all lined up, even though they were given at different times. According to the State, the fact that the witnesses' accounts dovetailed helped to give Rivera's, and the others', testimony the ring of truth. In one portion of the rebuttal argument, the State argued:

"How could all of these people know all of these things and they all match up? That's what you have to evaluate, and that's how you know the State has proven this case far beyond a reasonable doubt. Nobody testified the defendant didn't do it.

The defense argued to you that we didn't call any of the other people in the van other than Ezequiel Rivera. They have subpoena power. They can call anybody that they want."

Defendant did not object to this portion of the State's rebuttal argument.

¶ 28    In addressing defendant's second theme, the State argued in its rebuttal:

"The fact that there are no guns to compare to the bullets, why don't we have a gun? Ask him [defendant]. It was in his possession. He was the only one who had it other than Augustine Montez. Who knows what he did with it. He got rid of it. Of course we don't have ballistic evidence that matches it to a gun, because we don't have a gun. What did he do with it? I don't know. But it doesn't negate the story. It doesn't make Ezequiel Rivera a liar. It actually confirms that he was telling the truth that everybody jumped out of the van and ran, and then he went and cleaned the van."

Defendant did not object to this portion of the State's rebuttal argument.

¶ 29                          D. Verdict and Posttrial Proceedings

¶ 30    The jury returned verdicts of guilty of first degree murder and attempted first degree murder. The jury also found that, during each offense, defendant had personally discharged a firearm.

¶ 31    Following the trial, on December 11, 2015, defendant's trial counsel filed a motion for a new trial. The motion specifically challenged the trial court's ruling allowing Lucio's "hearsay testimony."

¶ 32    On December 23, 2015, defendant filed a *pro se* first amended motion for a new trial in which he alleged that his trial counsel provided ineffective assistance during the trial. On January 6, 2016, defendant filed a *pro se* motion to discharge his trial counsel, alleging that he had filed a complaint with the Attorney Registration and Disciplinary Commission against trial

counsel. On the same day, defendant also filed his *pro se* second amended motion for a new trial. On January 20, 2016, the trial court denied defendant's motion to discharge trial counsel and his second amended motion for a new trial. The trial court scheduled the matter for a hearing, pursuant to *People v. Krankel*, 102 Ill. 2d 181 (1984), on defendant's allegations that trial counsel was ineffective.

¶ 33 Thereafter, defendant retained posttrial counsel to handle the inquiry into trial counsel's conduct and to undertake the posttrial proceedings. Following his investigation, on May 12, 2017, posttrial counsel filed defendant's supplemental motion for a new trial, alleging that trial counsel was ineffective for failing to procure Czapla's testimony, either by reaching a stipulation with the State or by adjourning the trial to secure the witness. In the motion, posttrial counsel represented the substance of Czapla's previous testimony in codefendant Gonzalez's trial, but he did not include any copies of the testimony. Posttrial counsel alleged in the motion that Czapla would have testified consistently with his previous testimony (People v. Gonzalez, No. 09-CF-855 (Cir. Ct. Kane County)) that the car chasing Michael's white car was a "green two-door Honda with a hatchback," and he asserted that this account "impeached" Rivera's testimony. In addition, posttrial counsel expressly "adopt[ed] all prior arguments in [*sic*] advanced in any motion for a new trial or judgment of acquittal." Defendant did not challenge any aspects of the State's rebuttal closing argument in any posttrial motion.

¶ 34 On November 1, 2018, the matter finally advanced to a hearing. Defendant was the only witness called, and he provided testimony on his own behalf. Specifically, defendant testified that, when his trial counsel was finally appointed to represent him, counsel would discuss the case with him. Defendant testified that trial counsel had provided defendant with copies of transcripts from the trials of defendant's codefendants. Defendant testified that Czapla had previously testified that, on the day of the shooting, he observed a white car being chased by a green car that Czapla, according to defendant, believed to be a "Honda or Toyota or something with a hatchback." According to defendant, the parties in Hernandez's trial were able to reach a stipulation about Czapla's testimony. Defendant intimated that Czapla's testimony would have controverted Rivera's trial testimony because Rivera had testified that he was driving the gang members in a green van.

¶ 35 Following defendant's testimony, the State moved for a directed finding, characterizing the testimony as "basically *** what the defendant wanted [to be done] in this trial," without "any evidence that would have shown in any way that [trial counsel] was in any way ineffective in his representation of the defendant." The trial court granted the State's motion. The court held that defendant was not a credible witness and his contentions of ineffectiveness involved matters of trial strategy. Moreover, the court noted that defendant's own testimony characterized trial counsel's actions as "reviewing [all the evidence] over and over with the defendant," which suggested that trial counsel had prepared the case for trial.

¶ 36 The matter moved to sentencing. The trial court sentenced defendant to a 25-year term of imprisonment for first degree murder and a consecutive 10-year term of imprisonment for attempted murder. Defendant timely appeals.

¶ 37                                   E. Appellate Proceedings

¶ 38 This matter was scheduled for oral argument. On June 10, 2021, when the parties appeared for oral argument, this court orally noted the comments made by the State in its rebuttal closing argument: "Nobody testified the defendant didn't do it," and "The fact that there are no guns

to compare to the bullets, why don't we have a gun? Ask him. It was in his possession." We further noted that, in *People v. Givens*, 237 Ill. 2d 311, 325 (2010), an appellate court has the authority to address unbriefed issues where a clear and obvious error exists in the trial court proceedings. However, rather than *sua sponte* addressing the issue of the State's comments in its rebuttal closing argument, and possibly straying from our role as impartial jurists into speculation as to what arguments the parties might make and becoming advocates for one or the other side, we ordered the parties to focus on the comments quoted above and to provide supplemental briefing.

¶ 39 On June 16, 2021, the State filed a motion to vacate our order for supplemental briefing. The State argued that the comments did not constitute "obvious error" and that we had improperly "rais[ed] issues *sua sponte*." The order for supplemental briefing did not rectify the impropriety because we did not identify any "obvious error." The State also suggested that we had prejudged the issue because, in the comments at the original oral argument, we noted that we had discussed the issue. The State requested that this panel recuse itself from further consideration of this appeal. The State then proceeded to argue the merits of the issue, as it perceived it as a basis for vacation of the order for supplemental briefing. The State concluded with the following:

> "*Givens* only allows this panel to address clear and obvious error that can be resolved without speculation regarding the parties' arguments. *Givens*, 237 Ill. 2d at 329-30. By reviewing the record with an eye toward error, and then citing to the record in construing the comments at issue as remarks about defendant's failure to testify, the panel has done precisely what *Givens* proscribes: it has searched the record for an issue that was not argued or briefed by the parties and ordered the parties to brief that issue just in case it could represent error or to provide fodder for its already formed beliefs on the issue."

¶ 40 We denied the motion, and the parties have provided the requested supplemental briefing. Thereafter, on August 12, 2021, we held oral argument in this matter.

¶ 41 ## II. ANALYSIS

¶ 42 On appeal, defendant argues that his trial counsel was ineffective for not objecting to Rivera's improper other-crimes evidence and Rivera's testimony that he had to obey defendant's orders. Defendant also argues that Lucio's testimony about a handshake with defendant was inadmissible hearsay and its admission was reversible error. Defendant aggregates these claims of error into a cumulative-error claim. Defendant also argues that posttrial counsel was ineffective for failing to ensure that the record contained evidence supporting defendant's ineffective assistance claim against trial counsel regarding trial counsel's failure to secure Czapla's testimony, such as a transcript of the testimony. Finally, pursuant to our order for supplemental briefing, defendant argues that trial counsel was ineffective for failing to object to the State's remarks during its rebuttal closing argument. We consider these contentions in turn.

¶ 43 ### A. Ineffective Assistance—Rivera's Testimony

¶ 44 Defendant first argues that trial counsel was ineffective for failing to object to two portions of Rivera's testimony: first, the testimony about "plotting" to shoot a Vice Lords gang member

(the "plotting" testimony), and second, the testimony that Rivera believed that he had to follow defendant's instructions or face a violation (the "obey" testimony).

¶ 45     A claim that counsel provided ineffective assistance is resolved under the familiar *Strickland* standard. See *Strickland v. Washington*, 466 U.S. 668 (1984). To prevail under the *Strickland* standard, a defendant must show both that counsel provided deficient representation and that he or she was prejudiced by the deficient representation. *People v. Jackson*, 205 Ill. 2d 247, 259 (2001). To establish the deficiency prong, the defendant must show that counsel's performance was objectively below professional norms. *Id.* In addition, the defendant must overcome the strong presumption that the challenged conduct was the product of trial strategy. *Id.* To establish the prejudice prong, the defendant must show a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id.* The prejudice element may also be satisfied if the defendant is able to show that counsel's deficient performance rendered the result of the trial unreliable or the proceeding fundamentally unfair. *Id.* Finally, an ineffective assistance claim may be resolved on either prong alone without the need to address the other. *People v. Lear*, 175 Ill. 2d 262, 269 (1997).

¶ 46     Defendant first characterizes Rivera's "plotting" testimony as other-crimes evidence. At trial, Rivera testified that, while the group was "hunting," defendant suggested targeting an individual but was told to stand down by Montez because the individual was not a rival gang member. Later, while the group was waiting near the parole office, someone spotted an individual wearing the colors of a Vice Lords gang member and believed him to be a member of that rival gang. Rivera testified that defendant and the others in the back of the van "got to plotting," meaning they were developing a plan to shoot the rival gang member. Defendant contends Rivera's "plotting" testimony was inadmissible other-crimes evidence. According to defendant, a timely objection by trial counsel would have prevented the improper evidence from being admitted and it was prejudicial because it placed defendant in the van, which defendant insists touched "on the only issue in this case—whether [defendant] was present in the van at the time of the shooting."

¶ 47     Strictly speaking, any "plotting" was not a "crime," as talking is usually not of itself a criminal endeavor. However, the category of other-crimes evidence is broad enough to include acts that themselves may not constitute a criminal offense. *People v. McSwain*, 2012 IL App (4th) 100619, ¶ 35. The general rule is that other-crimes evidence is not admissible to show a defendant's propensity to commit crimes. Ill. R. Evid. 404(b) (eff. Jan. 1, 2011); *People v. Donoho*, 204 Ill. 2d 159, 170 (2003). The rationale is not that the evidence is not relevant; rather, it is too relevant and may tend to overpersuade the jury that the defendant is a bad person and deserving of punishment. *Donoho*, 204 Ill. 2d at 170. However, such other-crimes evidence may be admissible if it is for any other purpose, such as proving motive, opportunity, intent, *modus operandi*, preparation, plan, knowledge, identity, or absence of mistake or accident. Ill. R. Evid. 404(b) (eff. Jan. 1, 2011); *Donoho*, 204 Ill. 2d at 170.

¶ 48     Defendant contends that Rivera's "plotting" testimony "was facially inadmissible, because it failed to touch on the only issue in this case—whether [defendant] was present in the van at the time of the shooting." We disagree.

¶ 49     As an initial matter, the specific evidence of defendant's "plotting" to shoot a rival Vice Lords gang member is evidence of motive. Relevant evidence is evidence that has any tendency to make the existence of any fact of consequence more probable or less probable than it would be in the absence of the evidence. Ill. R. Evid. 401 (eff. Jan. 1, 2011); *People v. Rudd*, 2020 IL

App (1st) 182037, ¶ 50. While the State need not prove motive to sustain a murder conviction, motive evidence is nevertheless allowed under the reasoning that evidence that shows that the accused had a motive to kill the victim makes it more likely that the accused did in fact kill the victim. *Rudd*, 2020 IL App (1st) 182037, ¶ 50. Here, Rivera's testimony recounted the period shortly before the group settled on Michael and helps to provide the motive for that shooting: defendant was looking to shoot a rival gang member. Before Michael's appearance, the rival Vice Lords gang member was the most promising target for defendant to shoot. It thus makes the otherwise incomprehensible act of a drive-by shooting somewhat more understandable. See *People v. Doyle*, 328 Ill. App. 3d 1, 13 (2002) (motive evidence, such as gang rivalry, tends to bring clarity to an issue where there would otherwise be no reasonable explanation for the action).

¶ 50　　In addition, the evidence of the plotting is intimately intertwined with defendant's actions throughout the events of the shooting. As such, it is questionable that the "plotting" testimony was even other-crimes evidence at all. Our supreme court has recognized that evidence of other crimes may be admitted if it is part of the course of conduct, or a "continuing narrative," of the charged offense. *People v. Pikes*, 2013 IL 115171, ¶ 20. Where such evidence is part of the course of conduct or a continuing narrative of the charged offense, ordinary principles of relevancy apply and the rules applicable to other-crimes evidence are not implicated. *People v. Rutledge*, 409 Ill. App. 3d 22, 25 (2011). Here, the "plotting" testimony described the course of conduct, beginning with the group's unsuccessful hunting, continuing to the targeting of the Vice Lords gang member, continuing to the abandonment of the Vice Lords gang member as a target, and extending through the targeting and ensuing shooting and murder of Michael. As such, because the "plotting" testimony described events that occurred in the sequential course of conduct, it was admissible under ordinary principles of relevance and not under the rubric of other-crimes evidence.

¶ 51　　Because the evidence was admissible, an objection would have been fruitless. Because the objection would not have succeeded, trial counsel's performance was not deficient. See *People v. Clinton*, 2016 IL App (3d) 130737, ¶ 39 (it is not deficient in the *Strickland* sense for counsel to fail to perform a fruitless act). Likewise, because the evidence was admissible, no prejudice accrued from its admission. In the absence of prejudice, a claim of ineffective assistance of counsel cannot stand. *Lear*, 175 Ill. 2d at 269. Therefore, because defendant could not establish either deficient performance or prejudice, we reject defendant's contention that trial counsel was ineffective for failing to object to Rivera's "plotting" testimony.

¶ 52　　Defendant does not appear to provide a separate and direct argument that the probative value of the "plotting" testimony was substantially outweighed by its prejudicial effect. Accordingly, as a point not argued, it is forfeited. Ill. S. Ct. R. 341(h)(7) (eff. May 25, 2018); *People v. Tapley*, 2020 IL App (2d) 190137, ¶ 77 n.3. We note that defendant does argue that certain cases stand for the proposition that evidence will be rejected if the prejudicial effect substantially outweighs its probative value, but this argument is made inferentially and tangentially, and not as a separate and direct argument. We address those tangential contentions as they arise below. In addition, defendant does, of course, argue that he was prejudiced, but this is in relation to his ineffective-assistance claim, which is distinct from the ordinary principles of relevance. See Ill. R. Evid. 403 (eff. Jan. 1, 2011) (even relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice"). Thus, we deem defendant to have forfeited any consideration of the probative

nature versus prejudicial effect balancing test trial courts employ to determine whether to admit a particular piece of evidence.

¶ 53     Notwithstanding the forfeiture, we cannot say that the prejudicial effect of the "plotting" testimony substantially outweighs its probative nature. Generally, a court must consider the probative value in light of the temporal relation between the other-crimes evidence and its similarity to the charged offense versus the prejudicial effect. *People v. Bochenek*, 2020 IL App (2d) 170545, ¶ 59, *aff'd*, 2021 IL 125889. As noted, the "plotting" testimony was relevant to motive and the course of conduct. The testimony was about conduct sufficiently similar to the charged offense in that the group in the van was planning to commit a drive-by shooting against the Vice Lords gang member, and the group eventually committed a drive-by shooting in the murder of Michael. The "plotting" also occurred in the midst of the course of conduct leading to the charged offense. Indeed, the "plotting" testimony was so intimately intertwined with the group's conduct that it could well qualify as an inherent part of the charged offense, the exclusion of which would render the evidence of Michael's shooting incomprehensible. Thus, the "plotting" testimony was extremely probative for the purposes of course of conduct and motive. While the evidence was also prejudicial, it was not unduly so. Of course the "plotting" testimony showed defendant in a bad light, but that bad light is inherent in the nature of the conduct described and does not render the evidence unduly prejudicial. Accordingly, because the "plotting" testimony was extremely probative to the issues of motive and the course of conduct and was not unduly prejudicial, any such prejudice-versus-probative challenge to the "plotting" testimony would necessarily have failed.

¶ 54     Relying on *People v. Muhammad*, 257 Ill. App. 3d 359, 367 (1993), defendant challenges the suggestion that the "plotting" testimony was admissible. Defendant contends that, to be admissible, other-crimes evidence must be relevant to a material fact in issue. Defendant contends that the "plotting" testimony was gratuitous and not relevant to any material issue in this case. *Muhammad*, however, provides no succor to defendant's argument. In the very next substantive sentence in *Muhammad* following the statement defendant cites, the *Muhammad* court noted that, "[e]qually as well established [as the principle upon which defendant relied], however is the exception that the prosecution may present evidence probative of motive, intent, identity, absence of mistake or other material facts in issue even though such evidence discloses" other-crimes evidence. *Id.* at 368. *Muhammad*, then, essentially provides a recapitulation of the rules we recited above and refutes defendant's attempt to limit other-crimes evidence to when it is relevant to "a material fact in issue" even when it is also probative of motive, intent, identity, and the like.

¶ 55     Defendant asserts that motive was not an issue in the trial, especially because the State did not expressly argue motive to the jury. Defendant misapprehends the purpose of motive evidence in a murder case. Motive is not an essential element of the offense of murder. *People v. Aljohani*, 2021 IL App (1st) 190692, ¶ 93. Rather motive, in a murder case, is often offered to make the otherwise inexplicable understandable. *Doyle*, 328 Ill. App. 3d at 13. The "plotting" testimony precisely provides understanding of what would otherwise be inexplicable. The "plotting" testimony was offered in the context of a group of Latin Kings gang members "hunting" rival gang members to shoot. Much like a water hole in the savanna, the parole office offered a location where the gang's prey would reliably congregate. Sure enough, the group noticed first a Vice Lords gang member and then the more promising target (presumably due to the barbershop altercation) of Michael. The "plotting" testimony provided

- 11 -

context and motive and described the course of conduct for the shooting. Therefore, the "plotting" testimony was relevant and admissible.

¶ 56 In maintaining that motive was not at issue in this case, defendant relies on *People v. Lenley*, 345 Ill. App. 3d 399, 407 (2003), for the proposition that "[t]he motive exception to the general ban on other-crimes evidence arises in the context of other crimes that serve as the motive behind the crime charged." *Lenley*, however, is discussing a seemingly independent crime being offered as evidence of motive. Indeed, *Lenley* describes as an example of proper other-crimes evidence the introduction of evidence that the defendant killed a person who was scheduled to be a witness in the pending case. *Id. Lenley* does not consider, however, the situation where the bad act or other-crimes evidence is part of the conduct leading to the charged offense. Moreover, the "plotting" testimony illustrates the motive presented in this case: defendant and his brother gang members were seeking a rival gang member to shoot. Once they spotted a potential target, the Vice Lords gang member, they began planning how to accomplish their goal. In *Lenley*, by contrast, several independent offenses were sought to be admitted as other-crimes evidence under a slew of possible exceptions, and the discussion was tailored to account for the fact that the other offenses had been committed at earlier times. *Id.* at 407-09. *Lenley*, therefore, is plainly distinguishable.

¶ 57 Defendant also relies on *People v. Sanders*, 59 Ill. App. 3d 650, 654 (1978), for the proposition that other-crimes evidence is admissible only where it has "substantial independent relevance." The problem with defendant's proposition is that it provides only half of the story—the full quotation from that case belies defendant's formulation: "[Other-crimes] evidence, however, may be admissible where it has substantial independent relevance, such as to show motive, intent, identity, the absence of mistake or accident, or the existence of a common scheme or design." *Id.* Thus, *Sanders* expressly provides that motive testimony will already have substantial independent relevance. The "plotting" testimony has that independent relevance, both as motive and as course of conduct, and it helps the trier of fact to understand an otherwise inexplicable act. *Doyle*, 328 Ill. App. 3d at 13. Defendant, relying on *Sanders*, claims that "the State failed to establish the necessary relevancy between [Rivera's 'plotting' testimony] and the murder and attempted murder." Defendant's reliance is inapt, as the relevancy of the "plotting" testimony is to motive and course of conduct, and this type of evidence is expressly deemed to have "substantial independent relevance" and here was "directly pertinent to the crime for which [defendant was] on trial." *Sanders*, 59 Ill. App. 3d at 654. Accordingly, defendant's reliance on *Sanders* is unavailing.

¶ 58 Next, defendant argues that the "plotting" testimony was "unnecessary," relying on *People v. Thigpen*, 306 Ill. App. 3d 29 (1999). In that case, the State presented evidence of the charged murder and, under the guise of motive evidence, presented a detailed account of a double murder that a witness attributed to the defendant. *Id.* at 34-35. In discussing the propriety of the double-murder evidence regarding the various permissible exceptions to the prohibition against other-crimes evidence, the appellate court held that it was relevant to establish a common plan or scheme and was relevant to the identity of the defendant. *Id.* at 36-37. However, it was not relevant to establish *modus operandi*, motive, intent, or absence of mistake. *Id.* Despite that the double-murder evidence was relevant for some permissible purposes, the court held that the trial court "erred in allowing extensive details concerning [the double murder] into evidence." *Id.* at 37. The detailed nature of the double-murder evidence

"resulted in the probative value being outweighed by the prejudice resulting from the evidence." *Id.* at 36.

¶ 59 Here, however, the issue that concerned the *Thigpen* court is not present. Contrary to that case, the evidence here did not concern a crime. Moreover, the "plotting" testimony was part and parcel of the offense at bar, not another, wholly separate offense making up a common plan or scheme of individual crimes as in *Thigpen*. In short, the "plotting" testimony was not nearly so inflammatory as the double-murder evidence in *Thigpen*. The less incendiary nature of the "plotting" testimony plus the fact that it was intrinsic to the offense at bar renders the comparison to *Thigpen* and its double-murder evidence inapposite.

¶ 60 Defendant interleaves, somewhat confusingly, argument about the "obey" testimony into his discussion about the propriety of the "plotting" testimony, as if they were essentially the same. As best we can tell, defendant's argument seems to be that, because the "obey" testimony was improper, so too is the "plotting" testimony. That, of course, simply does not logically track, and we reject any attempt to analogize the "obey" testimony to the motive and course of conduct purposes of the "plotting" testimony.

¶ 61 With that said, we address, insofar as possible, defendant's specific arguments regarding the "obey" testimony. First, defendant appears to analogize the "obey" testimony to the double-murder evidence in *Thigpen*. This is flatly risible, both as a matter of degree (an actual double murder versus a hypothetical consequence of disobedience) and nature (evidence of other crimes extrinsic to the offense in *Thigpen* versus evidence of the witness's belief regarding his obligation to defendant during the ongoing offense here). Defendant minimizes the double-murder evidence in *Thigpen* as tangentially related despite that the appellate court found it to be relevant (albeit described overmuch) to the defendant's common design and his identity (*id.* at 36-37), while he inflates the magnitude of the "obey" testimony—which was but a single question to Rivera: "could you have said no to the defendant?" and Rivera's single-word answer, "No."

¶ 62 *Thigpen* is plainly inapposite. There, the double-murder evidence was presented in detail, and while it was part of a common design in that case, it was also extrinsic to the offense at bar. Here, Rivera was asked a single question to elicit if he believed that he could have disobeyed defendant during the course of the offense. Even if the testimony about that single question was improper, it was not further pursued, and it lined up with other testimony about the hierarchy of the Latin Kings gang at the time and the obligations of lower-ranking members to higher-ranking members. Thus, defendant's attempt to elevate the prejudicial value of the "obey" testimony to that of a detailed description of an extrinsic double murder is unavailing.

¶ 63 Next, defendant argues that, as well as being irrelevant to the issue of whether defendant participated in the offense, the combination of the "plotting" testimony and the "obey" testimony cast defendant as a bad person deserving of punishment. We disagree. As discussed, the hazard of other-crimes evidence is that the jury will conclude that the defendant is a bad person deserving of punishment and will decide the defendant's fate on that basis rather than on the evidence of the offense at bar. *People v. Manning*, 182 Ill. 2d 193, 213-14 (1998). However, such evidence is admissible where it is probative of material issues, such as motive and course of conduct. *Doyle*, 328 Ill. App. 3d at 13; *Pikes*, 2013 IL 115171, ¶ 20. The "plotting" and "obey" testimony explained Rivera's conduct during the offense and illuminated the motive for the shooting. Further, the testimony described the events in a linear fashion as they unfolded. We reject the contention.

- 13 -

¶ 64    Defendant also offers an unpersuasive chain of reasoning that the "plotting" and "obey" testimony was unduly prejudicial. First, defendant argues that the testimony showed that defendant indiscriminately targeted individuals for violence, including Rivera if he were to disobey, and that this constituted other-crimes evidence. Second, defendant contends that the testimony shed no light on whether defendant participated in the offense. Third, defendant contends that the "plotting" testimony, specifically, was redundant on the issue of motive because other testimony detailed the hierarchy of the Latin Kings gang. In the fourth and final link of the chain, defendant asserts that "the ['plotting' and 'obey'] testimony effectively served only one purpose—it impermissibly encouraged the jury to find [defendant] guilty" due to its revulsion at defendant. The problem with defendant's chain of reasoning is that the middle links do not support the conclusion he attempts to reach.

¶ 65    The second link, that the testimony sheds no light on his participation, misapprehends the import of the "plotting" and "obey" testimony. The "plotting" testimony is relevant to defendant's motive (and expressly places him in the vehicle as the shooter). As motive testimony, it need not conclusively prove that defendant committed the offense, but it is relevant, meaning that the evidence moves the arrow, making it more likely that defendant committed the offense. *Rudd*, 2020 IL App (1st) 182037, ¶ 50 (evidence that shows the accused had a motive to kill the victim is relevant because it makes it more probable that the accused did, in fact, kill the victim). Moreover, the "plotting" testimony expressly places defendant in the vehicle. Thus, the second link in the chain is rebutted by authority and is belied by the evidence itself, which expressly stated that defendant was in the vehicle.

¶ 66    Defendant's third link, that the "plotting" testimony was redundant to other evidence, seems to indiscriminately conflate the "plotting" and "obey" testimony. Defendant specifically discusses other evidence establishing the gang hierarchy but in the context of defendant's motive. As we have determined, the "plotting" testimony directly relates to defendant's motive, but the "obey" testimony seemed to deal more with the gang hierarchy (as well as provide an explanation as to why Rivera did what he did during the offense). Defendant's conflation is confusing. Defendant's larger point—that other evidence that described the gang hierarchy and the desire to move up within the hierarchy adequately explained the entirety of defendant's motive—is also misplaced. While the desire to progress in the hierarchy of the gang may have provided some motivation for defendant to undertake the shooting of Michael, the "plotting" testimony both provides an idea of the specific motive behind targeting Michael and directly describes the course of conduct of the offense. The testimony about the gang hierarchy provided by other witnesses touches not on this specific offense but only on defendant's ambitions with respect to his membership.

¶ 67    Finally, defendant concludes that the only purpose of the evidence was to elicit an emotional and unduly prejudicial response from the jury. This does not follow. The "plotting" testimony specifically involved defendant's motive in participating in this precise offense, as well as described the specific conduct leading to the offense. The "obey" testimony, regarding a single question and a one-word answer, explained Rivera's continued participation and reluctance to disobey his "assignment" to drive the vehicle during the offense, and it explained the gang's hierarchy and the obligations its members and aspiring members had to one another. Thus, both had independent relevance and were properly admissible.

¶ 68    In addition to the weakness of the chain of reasoning, the cases defendant cites to support it are distinguishable. Defendant cites *People v. Nixon*, 2016 IL App (2d) 130514, ¶ 35, for the

proposition that other-crimes evidence also refers to noncriminal misconduct. This proposition is unexceptionable, but it gets defendant only in the door, not to his conclusion. Defendant then cites *People v. Lewis*, 165 Ill. 2d 305, 345-46 (1995), for the proposition that other-crimes evidence should not be admitted unless relevant. Here, the "plotting" and "obey" testimony was relevant to motive and course of conduct; additionally, the "obey" testimony explained the internal gang structure and obligations as well as Rivera's individual conduct and participation in the offense. Finally, defendant cites *People v. Hale*, 2012 IL App (1st) 103537, ¶ 35, for the proposition that unduly prejudicial evidence carries the risk that a jury will decide a case on an improper basis, such as sympathy, contempt, hatred, or horror. Defendant does not explain how the "plotting" and "obey" testimony prompted the jury to decide this case on an improper basis. Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020) (points not argued are forfeited). Moreover, defendant overlooks *Hale*'s admonition that "[e]vidence that is relevant and otherwise admissible should not be excluded because it may also tend to prejudice the accused." *Hale*, 2012 IL App (1st) 103537, ¶ 35. Instead, such evidence, including other-crimes evidence, will be excluded only if the prejudicial effect substantially outweighs its probative value. *Id.* Again, defendant fails to explain how the prejudicial effect of the "plotting" and "obey" testimony substantially outweighs its probative effect. The "plotting" and "obey" testimony was extremely probative to motive and course of conduct and was not unduly prejudicial. See *Bochenek*, 2020 IL App (2d) 170545, ¶ 59 (discussing the balancing required between the probative nature of other-crimes evidence versus any prejudicial effect). *Hale*, therefore, is inapposite.

¶ 69    Defendant next argues that the "plotting" testimony was not an integral part of a continuing narrative. Defendant cites *People v. Abernathy*, 402 Ill. App. 3d 736, 751 (2010), for the proposition that other-crimes evidence is inadmissible if it concerns a separate, distinct, and unconnected crime. Contrary to defendant's implicit assertion, the "plotting" testimony described the course of the offense, from hunting, to waiting at the parole office, to observing a target of opportunity and planning how to attack that individual, to settling on Michael and committing the instant offense. It is thus intertwined with this offense, and, even under *Abernathy*, was properly admissible. We also note that *Abernathy*, despite warning that other-crimes evidence was inadmissible if it concerned a separate, distinct, and unconnected offense, found that the other-crimes evidence there was properly admitted because, while it involved a separate charge, it was part of a single occurrence. *Id.* The same is true here because the "plotting" testimony described what the members of the group, including defendant, were doing in seeking rival gang members to attack, in a single course of conduct that culminated with the murder of Michael.

¶ 70    Defendant also relies on *People v. Jacobs*, 2016 IL App (1st) 133881. Defendant describes the issue there as involving other-crimes evidence tending to suggest that the defendant, who was on trial for possession of a stolen motor vehicle, also committed a residential burglary and jewelry theft because the victims' son observed the defendant enter the stolen car at a pawn shop. *Id.* ¶¶ 17-23. The *Jacobs* court held that the other-crimes evidence was improper under the course of conduct exception because the defendant had not been charged with the burglary and jewelry theft and the prejudicial effect substantially outweighed the probative nature. *Id.* ¶¶ 69-70. The prejudicial effect was compounded by the fact that the other-crimes evidence had been precluded in a motion *in limine*, but was allowed at trial, and the defendant was not

allowed to elicit evidence that another person had been arrested for the burglary and jewelry theft. *Id.* ¶¶ 71-74.

¶ 71    Defendant argues that the "plotting" testimony was distinct from the offense at bar because it involved actions distinct from the shooting of Michael and Tuggles at locations distinct from where the shooting occurred. We disagree. As noted, the "plotting" testimony touches on both motive and course of conduct. Because the evidence is relevant to motive, the fact that it is also relevant for a different reason that may be improper does not undermine its admissibility for the proper reason. In addition, in *Jacobs*, the defendant was not charged for the other-crimes offenses and was blindsided at trial by their introduction. Here, by contrast, defendant was well aware of all of the evidence the State would likely seek to admit (from the trials of his various codefendants), and the "plotting" testimony had not been previously precluded. Finally, here, the "plotting" testimony is intertwined with the charged offense as the "plotting" was discontinued *because* Michael, the actual victim, was spotted at the parole office. *Jacobs* provides little support for defendant's contentions.

¶ 72    Defendant appears to argue that the prejudicial effect of the "plotting" and "obey" testimony substantially outweighed its probative nature. Defendant contends that informing the jury of defendant planning to shoot other individuals along with Rivera's belief that he could not refuse instructions from defendant was apt to paint him as a violent menace to society. We disagree. As we have extensively discussed, the "plotting" testimony was part of the course of conduct that comprised the instant offense. Further, a single sentence, that the "plotting" testimony was "apt to paint [defendant] as a dangerous menace to society," is insufficient to establish that the prejudicial effect substantially outweighed its probative nature. Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020); *Vancura v. Katris*, 238 Ill. 2d 352, 370 (2010) (insufficient argument will not satisfy Rule 341).

¶ 73    Because we do not find that the "plotting" and "obey" testimony was inadmissible, there was no error accruing from its admission. Further, defendant has failed to make a sufficient or persuasive argument that the prejudicial effect of the "plotting" and "obey" testimony substantially outweighed its probative nature. Thus, we cannot attribute any error to its admission, and as a result, there can be no prejudice accruing from this evidence. In the absence of prejudice, defendant's ineffective-assistance claim based on Rivera's testimony fails. *Lear*, 175 Ill. 2d at 269 (a claim of ineffective assistance of counsel may be resolved on either prong alone).

¶ 74                    B. Inadmissible Hearsay—Lucio's Testimony

¶ 75    Defendant next contends that the trial court erred in admitting Lucio's testimony about his handshake with defendant following the shooting (the "handshake" testimony). Lucio testified that, on November 28, 2005, he had seen Michael's wrecked car. Thereafter, he met Quentin at the house of Rivera's friend.

¶ 76    The following colloquy occurred:

> "[PROSECUTOR]: At some point, were you alone with Quentin Moore in a bedroom [at the house]?
>
> [LUCIO]: Yes.
>
> Q. Were you discussing the shooting that happened on Galena Boulevard?
>
> A. Yes.

- 16 -

Q. Did anyone enter the room at that time?

A. [Defendant].

\* \* \*

Q. So you and Quentin Moore are discussing the shooting that occurred on Galena. When this defendant enters the room, what happened next?

A. Quentin told me—

[DEFENSE COUNSEL]: Objection, Your Honor. This is hearsay.

THE COURT: Response?

[PROSECUTOR]: May we approach, Your Honor?

THE COURT: Sure.

(Whereupon, the following proceedings were had at the bench:)

THE COURT: Response?

[PROSECUTOR]: When Quentin Moore says to this witness[, 'S]hake his hand,['] that is a command. That is not a hearsay statement. A command cannot have [*sic*] a hearsay statement. As it relates to the second part of that statement, 'He took care of it,' it's for the effect [on] the listener, because this listener is going to shake hands to show respect to this defendant because of the statement. So it's offered for the effect on the listener.

THE COURT: Thank you.

Reply?

[DEFENSE COUNSEL]: It's an amazing reach, an amazing reach. He is going to testify that he heard something, and he is offering it for the truth of it, and you can't allow that to happen in this case. He wasn't there. He doesn't have any personal knowledge of it.

THE COURT: Who wasn't there?

[DEFENSE COUNSEL]: Lucio wasn't there.

THE COURT: He already testified he was in the back room.

[DEFENSE COUNSEL]: He wasn't there at the time of the incident that he is going to testify to.

THE COURT: Overruled.

(Whereupon, the following proceeding were had in open court, in the hearing and presence of the jury)

[PROSECUTOR]: I am going to ask you the question again. You and Quentin Moore are discussing the shooting. When this defendant enters the room, what happens next?

[LUCIO]: He tells me to shake that little n***'s hand.

[DEFENSE COUNSEL]: I'm sorry, what was the answer?

[LUCIO]: He told me to shake that little n***'s hand.

[PROSECUTOR]: Who told you that?

[LUCIO]: Quentin.

Q. And did he tell you anything else?

A. He is the one that took care of it.

Q. What did you do at that point?

[DEFENSE COUNSEL]: Objection again, Your Honor. That's pure hearsay.

THE COURT: Overruled.

[PROSECUTOR]: What did you do at that point?

A. I shook his hand.

Q. When you say shook his hand, did you do the Latin King handshake, or did you simply shake hands like non gang members?

A. I shook his hand like a Latin King.

Q. Did he pound his chest after shaking up with you?

A. Yes.

Q. Why did you shake up with the defendant at that time?

A. Because I was giving him his respect."

¶ 77    Defendant argues generally that the trial court erred in admitting the hearsay "handshake" testimony. While defendant was initially confused about whether this issue was preserved, it is apparent that it was. Trial counsel objected at trial, trial counsel filed a posttrial motion contending that the trial court erred in admitting the "handshake" testimony, and posttrial counsel expressly adopted the issues raised in previously filed posttrial motions. Thus, the issue was preserved.

¶ 78    Because the issue was preserved, we review it under the ordinary principles applicable to the admission of evidence. The admission of evidence is within the sound discretion of the trial court and will not be disturbed unless the court abused its discretion. *Pikes*, 2013 IL 115171, ¶ 12. An abuse of discretion occurs only where the trial court's decision is arbitrary, fanciful, or unreasonable or where no reasonable person would take the view adopted by the trial court. *People v. Illgen*, 145 Ill. 2d 353, 364 (1991).

¶ 79    Defendant argues that the trial court erroneously admitted both Quentin's order to Lucio to shake defendant's hand and Quentin's explanation that defendant was "the one that took care of it." At trial, the State argued that the order to Lucio to shake defendant's hand was a command and not hearsay. The State further argued that Quentin's statement that defendant was "the one that took care of it" was offered for its effect on Lucio, explaining why Lucio shook defendant's hand.

¶ 80    Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Ill. R. Evid. 801(c) (eff. Oct. 15, 2015). Hearsay, however, is not involved where the statement is offered, not for its truth, but for some other reason, like the effect on the listener. *People v. Whitfield*, 2018 IL App (4th) 150948, ¶ 47. Thus, an out-of-court statement offered to show the effect on the listener's mind or to show why the listener undertook subsequent actions is not hearsay and is admissible. *Id.* Nevertheless, the standard probative-value-versus-prejudicial-effect test applies to this sort of evidence, and it may be excluded where the prejudicial effect substantially outweighs its probative value. Ill. R. Evid 403 (eff. Jan. 1, 2011); *Whitfield*, 2018 IL App (4th) 150948, ¶ 47.

¶ 81    Both components of the "handshake" testimony were admissible for their effect on the listener, Lucio. Quentin told Lucio to shake defendant's hand. We note that commands are

generally not hearsay because the significance is the command itself and there is no truth being asserted in a command. *People v. Anderson*, 407 Ill. App. 3d 662, 674 (2011). In addition, there is no doubt that the instruction to shake defendant's hand was also admissible for its effect on Lucio, who proceeded to shake defendant's hand.

¶ 82    The second component, Quentin revealing to Lucio that defendant was "the one that took care of it," was also admissible for its effect on Lucio. Evidence established that Lucio was a relatively high-ranking and longstanding Latin Kings gang member at that time, while defendant had graduated from shorty to full gang membership only recently. Further testimony established that performing violent actions against the gang's rivals was a way to advance in standing within the gang. Lucio and Quentin had been discussing the shooting that took place earlier that day. When defendant entered, Lucio was instructed to shake defendant's hand because he was "the one that took care of it," meaning that defendant performed the shooting. Lucio complied with Quentin's instruction and shook defendant's hand, "giving [defendant] his respect," which was due because defendant performed the shooting. Thus, the second component explains why the relatively senior Lucio shook the relatively junior defendant's hand: because he had performed a violent service for the gang. Because the "handshake" testimony was admissible as nonhearsay evidence offered for its effect on the listener, the trial court did not abuse its discretion in overruling trial counsel's objection.

¶ 83    The State also argues that the "handshake" testimony was properly admissible as defendant's tacit admission. We first note that the State did not make this argument below. However, the trial court's judgment may be sustained on any basis supported by the record, so it is properly before us. *Aljohani*, 2021 IL App (1st) 190692, ¶ 38. Under the tacit-admission doctrine, a defendant's silence in the face of an accusation of criminal conduct may be introduced as a tacit or an implied admission of guilt. *People v. Ruiz*, 2019 IL App (1st) 152157, ¶ 13. While we note that the activities of the Latin Kings gang perhaps created a perverse incentive for an individual to claim "credit" for committing a criminal act in order to increase his standing within the gang, there was also abundant testimony about rule-breakers being subjected to physical violence for their infractions. It is reasonable to infer that claiming criminal "credit" where it was not due would subject a gang member to gang discipline and physical violence. Thus, if defendant had not participated in or had not been the shooter, he would have denied that he had performed the shooting, on pain of receiving at least a beating. Based on this consideration, defendant had sufficient motivation to deny that he was the shooter despite the perverse incentive to glorify one's criminal conduct and claim criminal "credit" that existed in the gang.

¶ 84    For a statement to be admitted as a tacit admission, the following elements must be satisfied: (1) the defendant must have heard the accusing statement, (2) the defendant must have had an opportunity to respond and remained silent, and (3) the accusing statement must have been such that the natural reaction of an innocent person would be to deny it. *Id.* However, tacit admissions should be received with caution and a careful consideration of the circumstances because a defendant's silence is inherently ambiguous and it may be motivated by factors other than a sense of guilt or the lack of an exculpatory story. *Id.* ¶ 37. While we believe that defendant had a sufficient incentive to deny Quentin's statement if it were untrue, the evidence does not show that defendant had the opportunity to hear enough of the conversation between Quentin and Lucio to understand that he was being "credited" or accused of Michael's shooting. The evidence showed that Quentin and Lucio were discussing the

shooting in a back room of Rivera's friend's house. Defendant entered the room, and Quentin told Lucio to shake defendant's hand because defendant was "the one that took care of it." The second component of the "handshake" testimony does not on its face suggest that defendant was the shooter; it is only through the context of the discussion of the shooting between Quentin and Lucio that it becomes understandable as a suggestion that defendant performed the shooting. Because defendant was not present for that portion of the discussion and no evidence shows that he could have or did overhear that portion of the discussion, it is unclear whether defendant understood the context sufficiently to have made a denial. Accordingly, we do not accept the State's tacit-admission argument.

¶ 85 Despite rejecting the State's alternate basis for admissibility, the "handshake" testimony was fully admissible and properly admitted as nonhearsay evidence offered for its effect on the listener, Lucio. Therefore, no error accrued from its admission.

¶ 86 Defendant argues that, when offering evidence of an out-of-court statement for its effect on the listener, the proponent must demonstrate that the statement is necessary and not simply probative or helpful. In support, defendant relies on three cases: *In re Zariyah A.*, 2017 IL App (1st) 170971, ¶ 89 (while an out-of-court statement to explain a person's course of conduct is not hearsay, it should be admitted only to the extent necessary to provide the explanation), *People v. Hardimon*, 2017 IL App (3d) 120772, ¶ 35 (in general, "statements made by an investigating officer during an interview with the suspected defendant are admissible if they are necessary to demonstrate the effect of the statement on the defendant or to explain the defendant's response"), and *People v. Theis*, 2011 IL App (2d) 091080, ¶ 33 ("an out-of-court statement that is necessary to show its effect on the listener's mind or explain the listener's subsequent actions is not hearsay"; without the police officer's statements to the defendant, the defendant's answers would have been nonsensical). In both *Hardimon* and *Theis*, the "necessary" language is in relation to the police interrogation of the defendant. In *Zariyah A.*, the court cited, as illustrative of the "necessary" rule, cases in which a police officer is describing his course of conduct, and it specifically notes that, while an officer may testify that he had a conversation with someone and acted upon the information received, the officer cannot testify about the substance of the conversation. *Zariyah A.*, 2017 IL App (1st) 170971, ¶ 89 (citing *People v. Johnson*, 199 Ill. App. 3d 577, 582 (1990)). Thus, in these cases, the heightened "necessary" standard, which defendant seeks to elevate to a universal standard for any evidence offered for the effect on the listener, arises specifically in the context of police investigations and interrogations. We believe this elevation to be unwarranted. See *Whitfield*, 2018 IL App (4th) 150948, ¶ 48 ("to the extent that *Theis* and *Hardimon* impose a higher degree of probativeness regarding an officer's statements or questions through their use of the word 'necessary,' we respectfully disagree. We find that questions and statements by police officers during a defendant's interrogation may still possess probativeness where they are simply 'helpful,' although perhaps not essential or 'necessary,' to a jury's understanding of the defendant's responses or silence."). Beyond *Zariyah A.*, *Hardimon*, and *Theis*, defendant offers no authority to support his suggestion that only "necessary" evidence may be admitted under the effect-on-the-listener exception. Because the cases on which defendant relies deal with police investigations and interrogations, they are inapposite to the circumstances here. We reject defendant's invitation to change the standard of admissibility of effect-on-the-listener evidence.

¶ 87    Defendant argues that the "handshake" testimony was "prejudicial hearsay" that was offered for the truth of the matter asserted. The "handshake" testimony, however, was, by definition, not hearsay. *Zariyah A.*, 2017 IL App (1st) 170971, ¶ 88 (statements offered to show their effect on a listener or to explain the listener's subsequent course of conduct are not hearsay). The effect on Lucio and his subsequent conduct is precisely what the "handshake" testimony was offered to elicit. As noted, Lucio was a longstanding and relatively senior member of the gang, while defendant was neither a longstanding member nor very high ranking. The "handshake" testimony explained why, when defendant interrupted Lucio and Quentin's discussion, Lucio nevertheless shook his hand and "gave him his respect" instead of charging defendant with an infraction for interrupting a discussion between two senior and full gang members. Accordingly, defendant's contention is unavailing.

¶ 88    Finally, we note that, to the extent that defendant's argument can be construed to assign error to the trial court for not *sua sponte* stripping out the substance of the "handshake" testimony and limiting it to the fact that a conversation occurred between Quentin, Lucio, and defendant and to the physical act of the handshake, such an argument is untenable. Defendant seems to particularly argue that the second component of the "handshake" testimony, in which Quentin stated that defendant was "the one that took care of it," was inadmissible hearsay, while, as we have discussed above, the physical act of handshaking and the occurrence of the conversation (if not the entire substance) were clearly admissible as nonhearsay evidence. It is the defendant's obligation to request limiting instructions regarding evidence that is admissible for one purpose but not admissible for another purpose. Ill. R. Evid. 105 (eff. Jan. 1, 2011) ("the [trial] court, upon request, shall restrict the evidence to its proper purpose or scope and instruct the jury accordingly"). However, defendant did not seek to have the trial court limit the purpose for which the jury would receive the "handshake" testimony. *People v. Darr*, 2018 IL App (3d) 150562, ¶ 59 (the party seeking to limit the admission of evidence to a particular purpose has the obligation to seek an instruction to that effect). *Darr* also seems to be rooted in the idea that arguments not timely made in the trial court are forfeited on appeal. See *id.* (rejecting the defendant's argument to require a trial court to issue limiting instructions in the absence of a defendant's request, reasoning that defendants who do not object at trial would receive a windfall because "out-of-court statements that are quite clearly offered at trial for reasons other than the truth of the matter would necessarily be declared inadmissible hearsay on appeal if the defendant had failed to object or request a limiting instruction," which would be an absurd result). Thus, to the extent that such an argument can be discerned in defendant's contentions, it fails for the reasons described in *Darr*. *Id.* We further note that defendant does not argue that trial counsel was ineffective for failing to request some sort of limiting instruction for the "handshake" testimony or that posttrial counsel was ineffective for failing to include the failure to request a limiting instruction as either error or ineffective assistance. As such, those arguments are forfeited. Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020).

¶ 89                                C. Cumulative Error

¶ 90    Defendant next argues that, even if each of the foregoing claims of error do not individually constitute reversible error, they cumulatively constitute reversible error. However, because none of the claims constituted error, there is no error to accumulate and no cumulative error. *People v. Williams*, 2020 IL App (1st) 162512, ¶ 114.

¶ 91                    D. Ineffective Assistance—Posttrial Counsel

¶ 92        Defendant argues that posttrial counsel provided ineffective assistance. A defendant is entitled to effective assistance of counsel during posttrial proceedings, and posttrial counsel's actions are measured against the *Strickland* standard. *People v. Howery*, 178 Ill. 2d 1, 51 (1997). Again, to prevail on an ineffective-assistance claim, a defendant must show both that counsel provided deficient representation and that he or she was prejudiced by the deficient representation. *Jackson*, 205 Ill. 2d at 259. For the deficiency prong, the defendant must show that counsel's performance was objectively below professional norms. *Id.* For the prejudice prong, the defendant must show a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id.* The claim may be resolved on either prong alone with no further need to address the remaining prong. *Lear*, 175 Ill. 2d at 269.

¶ 93        Defendant's claim of ineffective assistance of posttrial counsel is based on an underlying claim of ineffective assistance of trial counsel that defendant has not directly raised or argued before us. Defendant argues that trial counsel had subpoenaed Czapla to testify in this trial but, when he did not appear, trial counsel did not seek a stipulation to use Czapla's previous testimony or seek an adjournment to secure Czapla's presence to testify in person. Defendant contends that the failure to secure the testimony was deficient performance and the lack of the testimony was "potentially prejudicial" because Czapla's version of events impeached Rivera's testimony, particularly concerning the vehicle from which the shots were fired into the white car. At the posttrial hearing, defendant testified that his recollection of Czapla's testimony was that the shooting vehicle was a Toyota or Honda green two-door hatchback (Rivera's vehicle was a green Ford Windstar minivan). Defendant contends that there was a reasonable probability of prejudice based on the following considerations: (1) the inconsistency between Rivera's testimony that he was driving a minivan and Czapla's account that a smaller car was involved, (2) the weakness of codefendant testimony, especially where that codefendant has received significant concessions for the testimony, and (3) the inconsistency between Rivera's testimony that he received full gang membership for his participation in this shooting and other testimony that only persons who shot rivals qualified for full membership.

¶ 94        Defendant contends that posttrial counsel was ineffective for failing to enter into the record Czapla's testimony. While posttrial counsel referenced a transcript from the Gonzalez trial, no transcript was attached to the posttrial motion that posttrial counsel eventually filed. At the hearing on the posttrial motion, which included defendant's contentions of ineffective assistance of his trial counsel, defendant testified about Czapla's previous testimony. Posttrial counsel identified several exhibits, such as a summary of testimony from the trials of Gonzalez and Hernandez that defendant purportedly prepared for trial counsel, but posttrial counsel did not admit these exhibits into evidence or otherwise place them into the record. Instead, defendant summarized Czapla's testimony through his testimony at the hearing on the posttrial motion. Defendant argues that the failure to include a transcript of Czapla's testimony, either with the posttrial motion or as evidence from the hearing on the posttrial motion, constituted ineffective assistance. Defendant argues that the failure to make sure Czapla's testimony was preserved in the record constitutes deficient performance and that the lack of the testimony was prejudicial.

¶ 95    The State disagrees that the lack of a transcript of Czapla's testimony in the record is an insurmountable hurdle and that the claim of ineffective assistance of posttrial counsel, as it involves information *dehors* the record, is better suited to a postconviction petition. Defendant rejoins that we may take judicial notice of our own records, and defendant has included in the appendix to his brief on appeal an exhibit purportedly from the Hernandez trial that was contained in the record in *Hernandez*, 2014 IL App (2d) 120947-U, namely, a stipulation between the State and Hernandez and a copy of Czapla's testimony from the Gonzalez trial. (We also note that posttrial counsel's posttrial motion contains a reference to the transcript of Czapla's testimony that appears to line up with the transcript that defendant included in the appendix to his brief on appeal.)

¶ 96    We do not have to resolve the catch-22 defendant finds himself in as he attempts to argue the substance of the information contained in a document that is clearly not part of the record on appeal because defendant's argument founders on the rocks of prejudice. Prejudice, in the *Strickland* sense, means that there is a reasonable probability that the result of the proceeding would have been different. *Jackson*, 205 Ill. 2d at 259. The success of defendant's claim that posttrial counsel was ineffective is tied to the success of the allegation that trial counsel's failure to introduce Czapla's testimony in some form constituted ineffective assistance. Regarding posttrial counsel specifically, prejudice would mean a reasonable probability that the trial court would have granted the posttrial motion. However, to obtain that outcome (the granting of the posttrial motion), posttrial counsel would have had to demonstrate prejudice arising from trial counsel's failure regarding Czapla's testimony, and this would mean a reasonable probability that the result of the *trial* would have been different. Defendant's argument to us, cunningly or carelessly, conflates the standards and seeks to have us assess whether prejudice accrued from trial counsel's failure to obtain Czapla's testimony by considering not whether Czapla's testimony would have resulted in a not guilty verdict, but whether it would have resulted in the grant of the posttrial motion. The correct standard, however, and the one we must consider, is whether the inclusion of the substance of Czapla's testimony at trial would have resulted in a reasonable probability of a different outcome *at trial*.

¶ 97    As represented, Czapla's testimony is broadly corroborative of Rivera's testimony. Czapla's testimony was represented to be that a two-door green car with a hatchback was the shooting vehicle. The evidence showed that a green minivan was the shooting vehicle. A minivan has two doors, two sliding doors, and a back gate. This is superficially a match for the vehicle Czapla described. Czapla's testimony was represented to be that the shooting vehicle was a small car and of foreign make, while the evidence established that Rivera was driving a Ford minivan. Thus, while details between Czapla's testimony and Rivera's are inconsistent, the vehicle Czapla described nevertheless resembles the vehicle the evidence shows that Rivera was driving. Czapla's testimony was also represented to be that he was distracted and speaking on his cell phone at the time he encountered the shooting vehicle, which occurred just after a white car had cut him off. Further, Czapla's testimony was internally contradictory at times and equivocal. Therefore, the value of Czapla's competing version of events was lessened by its own internal contradictions and equivocation.

¶ 98    Based on the broad-stroke corroboration Czapla's testimony provided to Rivera's testimony, its inherent weaknesses, and all the other evidence elicited during defendant's trial, we cannot say that, even had Czapla testified in person, or had his previous testimony been

presented through a stipulation, there exists a reasonable probability that the outcome of defendant's trial would have been different. In other words, because no prejudice accrued from trial counsel's failure to obtain the substance of Czapla's testimony, no prejudice could accrue from posttrial counsel's failure to make the substance of Czapla's testimony part of the record (although, arguably, the points of inconsistency between Czapla's and Rivera's testimony were made part of the record on appeal through defendant's own testimony during the hearing on the posttrial motion). In the absence of prejudice, defendant's claim of ineffective assistance of posttrial counsel cannot stand. *Lear*, 175 Ill. 2d at 269.

¶ 99                    E. The State's Rebuttal Closing Argument

¶ 100    We ordered the parties to brief whether defendant's trial counsel was ineffective regarding the State's rebuttal closing argument and, in particular, the statements, "Nobody testified the defendant didn't do it," and "why don't we have a gun? Ask him [defendant]." Our order was rooted in the concern that the noted statements violated defendant's constitutional rights as improper and direct comments on defendant's right not to testify. Generally, an appellate court should not decide unbriefed issues, but where the error is "clear and obvious," this proscription is relaxed. *Givens*, 237 Ill. 2d at 327. Indeed, it is well-settled that there are times "when obvious deficiencies in representation will be addressed by an appellate court *sua sponte*." *Massaro v. United States*, 538 U.S. 500, 508 (2003). The caveat to a reviewing court reaching an unbriefed issue *sua sponte*, however, is to avoid speculation about the arguments the parties might make because imagining the parties' arguments risks crossing the line from a neutral jurist to an advocate for one or the other side. *Givens*, 237 Ill. 2d at 328. Balancing the concern over the prosecutor's statements with a *sua sponte* resolution, we decided the better course was to order supplemental briefing. *People v. Hobson*, 2014 IL App (1st) 110585, ¶ 21. We note that *Hobson* suggests that supplemental briefing is appropriate where the appellate court discovers that trial counsel committed an obvious error. *Id.* Here, the comments raise grave questions concerning possible constitutional violations; thus, even though we are not convinced that any error accruing from the comments is reversible error, we believe it was appropriate to allow the parties to articulate their arguments on the issue of whether trial counsel was ineffective for failing to object to the comments.

¶ 101    The State filed a motion to vacate the order for supplemental briefing, which we denied. In that motion, the State essentially voiced the concerns we ourselves considered before requesting supplemental briefing. The State went on, however, to baselessly assert that we had "abandoned [our] roles as jurists," "become advocates for defendant," and "predetermined the issue." To its credit, the State has since apologized for creating "the appearance of disrespect or incivility to this Court." We accept the apology, with a gentle reminder that one can disagree without being disagreeable.

¶ 102    Defendant argues that trial counsel's failure to object constituted ineffective assistance. To recap, a defendant must demonstrate both deficient representation and prejudice accruing from the deficient representation to prove that counsel was ineffective. *Jackson*, 205 Ill. 2d at 259. The wrinkle to our inquiry now is that defendant's assertion of ineffective assistance is based on statements made in closing argument. While the deficient-representation prong remains the same, when the claim involves a prosecutor's closing argument, the prejudice prong is similar to that used in a plain-error inquiry. *People v. Jackson*, 2020 IL 124112, ¶ 83.

- 24 -

¶ 103     The State argues, in essence, that we should use a straight plain-error analysis in determining whether defendant was prejudiced. Plain error may be invoked only where the evidence is closely balanced, so that the error alone threatens to tip the result against the defendant, or where the error is structural, meaning that it affected the fairness of the trial, regardless of the closeness of the evidence. *Id.* ¶ 81. A prosecutor's comments on a defendant's refusal to testify on his or her own behalf, while improper, do not constitute structural error. *People v. Herrett*, 137 Ill. 2d 195, 215 (1990); but see *People v. Berry*, 264 Ill. App. 3d 773, 777 (1994) (comments on a defendant's postarrest silence are still analyzed to determine if they were of such magnitude to deprive the defendant of a fair trial, as is suggested by the disjunctive "or" separating the two prongs of plain-error analysis). For purposes of plain-error analysis, "closely balanced" means that the key testimony is uncorroborated by extrinsic evidence and the testimony presents a choice between competing and plausible accounts. *People v. Olla*, 2018 IL App (2d) 160118, ¶¶ 34-35. However, if one account is not plausible, or one account is supported by extrinsic evidence and the other is not, the evidence will not be deemed to be closely balanced. *Id.* ¶ 35.

¶ 104     Here, while the evidence against defendant is not overwhelming, it is substantial and not closely balanced. Yes, Rivera was a key occurrence witness, but his testimony lined up with the physical evidence; he testified that defendant used a 9-millimeter handgun and this was corroborated by the spent shell casings that were recovered. His description of his driving and how the shooting occurred lined up with Michael's wounds and the bullet damage to his vehicle. In addition, Lucio told the authorities about the shooting at a different time than Rivera did, and Lucio identified defendant as the shooter to them independently of Rivera. The points of agreement between the witnesses substantially corroborates all their testimony, and we conclude that the evidence was not closely balanced. *Id.* ¶¶ 34-35. Thus, a straightforward plain-error analysis suggests that, even if we presume that the noted comments were erroneous, there is no prejudice accruing from them, so the error is not reversible.

¶ 105     The plain-error analogy for remarks in closing argument, however, simply does not straightforwardly apply. The *Jackson* court explained that, while the standard is similar, "[a] reviewing court will find reversible error only if the defendant demonstrates that the remarks were improper and that they were so prejudicial that real justice was denied or the verdict resulted from the error." *Jackson*, 2020 IL 124112, ¶ 83. Given our conclusion that the evidence against defendant was substantial, we cannot say that the verdict resulted from the two brief, isolated statements in the rebuttal closing argument. Likewise, we cannot say that the remarks undermined the integrity of the trial. The remarks were made in the context of explaining how the testimony of the key witnesses lined up and how the State fulfilled its burden of proving the charges beyond a reasonable doubt. The statement, "Nobody testified the defendant didn't do it," was a step too far, but it was fully within the context of the remarks that the key witnesses were all consistent with each other in placing the responsibility for the shooting on defendant. Likewise, the statement, "why don't we have a gun? Ask him," was in the context of responding to defendant's argument that no physical evidence linked him to the offense. Indeed, it was directly responsive to defendant's closing argument, and it was delivered in the context of explaining that the physical evidence was consistent with Rivera's testimony. We cannot say that these two isolated statements, in the context of the rebuttal closing argument, which extended for 20 pages of transcription, undermined the overall integrity of the trial.

¶ 106    That, of course, is not to say that we approve of the State's argumentation choices. We most emphatically do not. In *People v. Johnson*, 208 Ill. 2d 53, 65-67 (2003), our supreme court addressed both prosecutorial misconduct and courts' ineffectual hand wringing in condemning such conduct but affirming convictions in cases in which pervasive prosecutorial misconduct has occurred. We do not discern a pattern of pervasive misconduct in this case; rather, the State's statements were isolated and brief, and regarding the "Ask him" remark, it was closely akin to an invited response. However, we note that, "Nobody testified the defendant didn't do it," is an improper and direct comment on defendant's exercise of his right not to testify. *Id.* at 112 (the State may indicate that evidence is uncontradicted so long as it does not highlight the fact that only the defendant " 'could have done the contradicting' " (quoting *People v. Keene*, 169 Ill. 2d 1, 21 (1995))). Likewise, while akin to an invited response, stating "Ask him" also highlights defendant's decision not to testify. *Id.* We conclude, therefore, that the State crossed the line of propriety in its rebuttal closing argument, and we caution the State not to repeat such improper arguments in the future.

¶ 107    Nevertheless, because we have determined that defendant cannot establish prejudice, he cannot sustain a claim of ineffective assistance of counsel. *Lear*, 175 Ill. 2d at 269. As a result, we need not consider whether trial counsel's representation fell below an objective standard of reasonableness when counsel failed to object to the noted portions of the State's rebuttal closing argument.

¶ 108    Initially, defendant confines his analysis of prejudice to recapitulating his argument regarding Rivera's credibility. According to defendant, because Rivera was incredible, and because Lucio's handshake testimony was inadmissible, prejudice accrued from the State's comments in its rebuttal closing argument. This argument does not logically track. The issue is whether the State's comments were improper (deficient-performance prong) and whether "they were so prejudicial that real justice was denied or the verdict resulted from the error." *Jackson*, 2020 IL 124112, ¶ 83. An assessment of the sufficiency of the evidence sheds no light on the actual issue.

¶ 109    Defendant also suggests that, because the comments were made during the State's rebuttal closing argument, their prejudicial impact was enhanced. To support the contention, defendant relies on *People v. Green*, 209 Ill. App. 3d 233, 245 (1991). We agree that, where improper comments are made during the State's rebuttal closing argument, the defendant does not have an opportunity to respond to them. *Id. Green* does not, however, support the proposition that any improper comment made during the State's rebuttal closing argument will be deemed prejudicial. The remainder of the analysis in *Green* shows that improper comments made during the rebuttal closing argument are considered in the same fashion as improper remarks made during the State's initial closing argument: the entirety of the closing arguments of both the State and the defendant must be considered so as to place the objectionable comment into proper context, the State has wide latitude in making its closing arguments, and to constitute reversible error, the comments must "result in substantial prejudice to the defendant." *Id.* In our consideration of the comments above, we adhered to the general outline of the analysis discussed in *Green* and, more specifically, to the analysis mandated by our supreme court in *Jackson*. Even though the remarks occurred during the State's rebuttal closing argument, the evidence was not so closely balanced that the verdict resulted from the noted comments, and neither did they deprive defendant of a fair trial when considered in their proper context. Thus, defendant's reliance on *Green* is unavailing.

¶ 110 Defendant argues that the prejudicial impact of the noted comments "was especially acute here[,] where the State's evidence was not overwhelming." Again, we agree that the evidence was not overwhelming. Contrary to defendant's implied contention, however, although the evidence cannot be characterized as overwhelming, it does not mean that the evidence was thus closely balanced. Defendant seems to suggest that the State's case succeeds or fails based on Rivera's testimony alone. While we agree that Rivera's testimony is critical, we also note that, as argued by the State, Rivera's testimony lines up with that of the other cooperating witnesses, the independent witnesses, and the physical evidence. Thus, we conclude that there is substantial evidence in support of the verdict, albeit not overwhelming, and we further conclude that the evidence is not closely balanced. Defendant's contention that the evidence is not overwhelming, while accurate, is incomplete. Defendant's implied contention that the evidence was closely balanced is not supported by the record, and we reject it.

¶ 111 Defendant contends that, in considering the prejudice prong for purposes of an ineffective-assistance claim, a defendant need not prove by a preponderance of the evidence that the outcome would have been different, only that there is a reasonable probability of a different outcome, even if the chances of acquittal are significantly less than 50%, so long as a not-guilty verdict could have been reasonably returned. *People v. McCarter*, 385 Ill. App. 3d 919, 935 (2008). Defendant is correct that a "reasonable probability" for purposes of the prejudice prong of an ineffective-assistance analysis does not translate into more likely than not. With that said, under the specific circumstances of this case, our supreme court's analysis in *Jackson* is more directly applicable. In general terms, even under *McCarter*, given that the evidence of defendant's guilt was substantial, although not overwhelming, the noted comments do not undermine our confidence in the verdict, and defendant has failed to show that a not-guilty verdict would have been reasonable considering the totality of the evidence and arguments in this case. *Id.* (the court must consider the totality of the record in determining whether the objectionable evidence was sufficient to undermine the reviewing court's confidence in the outcome).

¶ 112 Defendant contends that other courts have found prejudice accruing from similar remarks. While that may be true, it is a logical fallacy to extrapolate that, because a particular remark in one case was prejudicial, any similar remark in another case must be prejudicial too. The prejudicial nature of any evidence or argument is fact dependent, and what is prejudicial under the circumstances of one case may not be prejudicial under the circumstances of a different case. With that said, defendant points to three cases in which similar remarks were made. In *People v. Harbold*, 124 Ill. App. 3d 363, 371 (1984), the State "argued that no evidence showed defendant to be not guilty." Specifically, the State argued: " 'What you see is that there is not one smallest piece of evidence that shows that [the defendant] is not guilty of this offense.' " *Id.* The court noted that the State also repeated the argument at least four more times, despite the trial court sustaining objections to the argument each time. *Id.* at 371-72. Based on the repetition of the remarks, the court concluded that the defendant had been prejudiced. *Id.* Here, the noted comments were isolated and, considered in the context of the entirety of the parties' arguments, did not result in prejudice. *Harbold*, therefore, is distinguishable.

¶ 113 In *People v. Fluker*, 318 Ill. App. 3d 193, 203 (2000), the State argued: " 'Did anybody come on that stand and say that man didn't do it?' " The court held that this remark was improper. We note that the court reversed based on "the pervasive misconduct of the prosecutor in rebuttal [closing] argument." *Id.* at 202. Moreover, the court held that the case "presented a

very close question concerning the credibility of the out-of-court identifications of [the] defendant as the shooter" in determining that the verdict had been the result of the improper remarks. *Id.* at 204. Here, the remarks were not part of a pattern of pervasive misconduct but were isolated. Further, the evidence here was not closely balanced, and based on the entirety of the closing arguments and the record, the remarks did not constitute a material factor in the verdict. Accordingly, *Fluker* is distinguishable.

¶ 114   Finally, in *People v. Giangrande*, 101 Ill. App. 3d 397, 402 (1981), the State argued: " 'Now where's the evidence that the defendant didn't do it?' " (Emphasis omitted.) The court held that it could not conclude that this remark, along with other remarks during closing argument, did not result in substantial prejudice to the defendant. *Id.* at 403. The court also noted that the evidence in the case was closely balanced, so that other errors made during the trial contributed to the verdict of guilty. *Id.* at 404. In *Giangrande*, there were multiple errors, and the evidence in that case was closely balanced. Here, by contrast, the remarks were isolated and there were not multiple other errors. Further, the evidence of defendant's guilt in this case is substantial, although not overwhelming. For these reasons, *Giangrande* is distinguishable.

¶ 115   We conclude, therefore, that defendant cannot maintain a claim of ineffective assistance stemming from trial counsel's failure to object to the noted comments in the State's rebuttal closing argument. We also note that consideration of the comments as plain error is similarly unavailing because defendant cannot establish the requisite prejudice.

¶ 116                                  III. CONCLUSION
¶ 117   For the foregoing reasons, the judgment of the circuit court of Kane County is affirmed.

¶ 118   Affirmed.