NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2025 IL App (4th) 240933-U

NO. 4-24-0933

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
September 29, 2025
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | McLean County |
| BRENT J. BURTON, | ) | No. 21CF374 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | William A. Yoder, |
| | ) | Judge Presiding. |

JUSTICE ZENOFF delivered the judgment of the court.
Justices Knecht and Grischow concurred in the judgment.

**ORDER**

¶ 1    *Held*:   The appellate court reversed defendant's convictions and remanded the cause for a new trial where the trial court's failure to comply with Illinois Supreme Court Rule 431(b) (eff. July 1, 2012) during jury selection was a clear and obvious error and the evidence at trial was closely balanced.

¶ 2    On January 19, 2024, a jury found defendant, Brent J. Burton, guilty of home invasion (720 ILCS 5/19-6(a)(6) (West 2020)) and criminal sexual abuse (720 ILCS 5/11-1.50(a)(2) (West 2020)). The trial court sentenced defendant to eight years in prison. He appeals, arguing that the court failed to properly admonish prospective jurors during *voir dire* in accordance with Illinois Supreme Court Rule 431(b) (eff. July 1, 2012). For the following reasons, we reverse and remand for a new trial.

¶ 3                        I. BACKGROUND

¶ 4    On April 7, 2021, the State charged defendant with residential burglary (720 ILCS

5/19-3(a) (West 2020)), three counts of criminal sexual abuse (720 ILCS 5/11-1.50(a)(1), (2) (West 2020)), and aggravated driving under the influence while his driver's license was revoked (625 ILCS 5/11-501(a), (d)(1)(G) (West 2020)). On March 15, 2023, the State brought six additional charges: four counts of home invasion (720 ILCS 5/19-6(a)(6) (West 2020)) and two counts of criminal sexual abuse (720 ILCS 5/11-1.50(a)(2) (West 2020)). Ultimately, the State proceeded to trial only on one count of home invasion and one count of criminal sexual abuse. The State alleged that on or about March 28, 2021, defendant entered the residence of C.B. without authority, knowing C.B. to be present, then committed criminal sexual abuse against C.B. when he "touched and rubbed against the back of C.B. with his penis through the clothing while C.B. was sleeping" and could not give knowing consent.

¶ 5                                          A. *Voir Dire*

¶ 6            The jury trial began on January 16, 2024. The trial court started by summarizing the charges against defendant to the venire. The court then stated, "A defendant is not required to prove his innocence, nor is the defendant required to present any evidence at all. Moreover, a defendant has a constitutional right not to testify, and the jury may not draw any inference of guilt if the defendant does not testify." Once *voir dire* began, the court provided more details about these principles:

> "So I'm now going to read to you a series of four legal principles. These are called the *Zehr* principles [(see *People v. Zehr*, 103 Ill. 2d 472 (1984))]. Z-e-h-r, *Zehr* principles. After I read these I'm going to come to each one of you by name individually and ask whether you understand and accept each of these four legal principles.
>
> Do each of you understand and accept each of the four legal principles.

First, that the defendant is presumed innocent of the charges against him. Second, that before a defendant can be convicted the State must prove the defendant guilty beyond a reasonable doubt. Third, that the defendant is not required to offer any evidence on his own—I'm sorry. That the defendant is not required to offer any evidence on his own behalf, and four, that the defendant's failure to testify cannot be held against him.

Do each of you understand and accept each of those four legal principles?" Each prospective juror individually confirmed that they understood and accepted these principles.

¶ 7 The trial court gave the State, then defendant, the opportunity to ask further questions of the prospective jurors. Defense counsel began by saying,

"Good morning, ladies and gentlemen. I want to first start with what the Court had admonished you earlier, and those are the *Zehr* principles, because they are the foundation of the criminal justice system. The Judge read those principles to you, but I want to repeat them again.

First of all, as you all understand, you have all already heard from the Court that there is—in our system there is a presumption of innocence that is attached to anyone who is accused of a crime. The second principle is that before the State, before the State can convict—I'm sorry. Before the defendant can be convicted the State must prove its case beyond a reasonable doubt. The third principle, the *Zehr* principles, is that an accused is not required to present any evidence, and the last principle, an accused is not required to testify, and if he chooses not to, you cannot hold that against them. All of you were asked if you understood and agreed with the principles, and all of you acknowledged that you would."

¶ 8         Once the jury was selected and sworn, the trial began and continued until January 19, 2024. The following evidence was presented.

¶ 9                                    B. C.B.'s Testimony

¶ 10        C.B. testified that she had lived in her house in Colfax, Illinois, since November 2001. She explained that she "[h]ardly ever" locked her door "unless [she] was gone for several days." She stated that she met defendant in the fall of 2020 through her work as a bartender at Finish Line Sports Bar (Finish Line), then hired him to cut some of the trees in her front yard and helped him file his taxes. Their friendship eventually developed into a romantic relationship around the end of October or beginning of November 2020. She said they dated for about three to four months. When asked about when the relationship ended, C.B. testified that "it started in January when [she] started trying to get [defendant] to leave [her] alone" because she "was starting to see characteristics that [she] didn't like." However, she would then "find forgiveness and try again."

¶ 11                            1. *The Events of January 2 and 3, 2021*

¶ 12        C.B. testified that she tried ending the relationship with defendant multiple times. She also confirmed that she and defendant had "ups and downs" starting in December and during each "down phase," defendant would call and text her excessively. One such example occurred on the night of January 2, 2021, and continued into the morning hours of January 3. C.B. stated that defendant entered her house uninvited that night. At 11:05 p.m., C.B. texted defendant, "Where r u??" She testified that this was an invitation to come to Finish Line. Defendant then texted C.B. at 12:48 a.m., asking if he could come over; though she testified that she told him he could not, there was no such text in the record. C.B.'s call log shows an accepted call from defendant at 12:55 a.m. that lasted nine seconds. She testified that she did not invite him to her house during that call.

¶ 13        After C.B. finished her shift at Finish Line around 1 a.m., she and her friend went to a bar. She noticed that defendant's truck followed her but turned when C.B. and her friend got to Colfax and continued to another bar. When C.B. and her friend returned to C.B.'s house, they found defendant's truck in her driveway and defendant in the kitchen. She testified that she left her door unlocked that night for herself, not for him. C.B. confronted defendant and "started yelling at him asking him what are you doing here, why are you here." Defendant said he wanted to see her and then "started calling [her] a bunch of names" and left. Defendant called C.B. eight times between 1:59 a.m. and 2:06 a.m., and C.B. did not answer. At 2:20 a.m., defendant texted, "where did the 6 rubber [*sic*] go that you had in your dresser." C.B. texted defendant at 2:22 a.m., "I was pissed cause u didn't let grace out, there were skittles all over my kitchen floor, cigarette butt on my step." At 2:24 a.m., she texted, "I'm NOT answering your calls!!!!" and at 2:36 a.m., she texted, "Just leave me the f*** alone *** why the f*** would I have a relationship with you? I'm NOT a f*** hypocrite." Defendant called C.B. 18 times between 2:53 a.m. and 10:09 a.m. and continued to text her between 2:38 a.m. and 8:36 p.m., but she did not answer. C.B. testified that this was "[o]ne of the times [she] tried breaking up with [defendant]." C.B. clarified that they were not in a relationship at that time but that they did later work on their relationship.

¶ 14        2. *C.B. and Defendant's Interactions Between January 5, 2021,*

*and February 18, 2021*

¶ 15        C.B. texted defendant on January 5, 2021, stating: "I don't want you in my life and especially, I dont want you in [my son's] life" and "Im f*** done." C.B. characterized this as "[a]nother attempt" to break up with defendant. C.B. agreed that there were several text messages from defendant in January 2021 to which she did not respond. She then reinitiated contact with defendant on January 6 and explained why she had been in a bad mood the day before. She testified

that she and defendant argued again at the end of January. On January 28, 2021, C.B. texted, (1) "F*** you you stupid mother f***! Leave me the f*** alone. I'll be damned if I support another worthless mother f***" and (2) "All I said was I can't have you living at my house for free and especially on nights I have my son, im breaking my custody.. and you get pissed. Shows your true f***colors and intentions. F*** off. Keep texting and calling, I will go to the cops." She testified this was her fourth time trying to break up with defendant.

¶ 16    C.B. and defendant texted back and forth again starting on February 3, 2021. She invited him over on February 4. On February 6, she texted, "After tonight, I am DONE. I dont need a man in my life, and you f*** proved it to me" and "Leave me alone." Defendant texted her multiple times between February 7 and 9, and she did not respond. She began responding again on February 9. Defendant went to her house around February 12. They appeared to have another falling out around February 15. Defendant sent many unanswered text messages between February 15 and 18. On February 18, C.B. texted, "I dont want a relationship. Period" and "Stop texting and calling." Defendant said, "Ok all I need to know we r done then," and C.B. replied, "Yes! Bye!"

¶ 17    3. *C.B. Purportedly Ends the Relationship Permanently*

¶ 18    C.B. stated that the "back and forth" with defendant ended on February 19, 2021. C.B. testified that she and defendant had a conversation on Valentine's Day where she "was affirmative that [she] was done-done" and "[t]here was no more." She stated that she never invited defendant over to her house again after that date and she only communicated with him to facilitate the return of her belongings, though defendant "would text all the time, or call all the time, and [she] wouldn't respond."

¶ 19    4. *Continued Interaction Between C.B. and Defendant*

*Up to March 27, 2021*

¶ 20        Nevertheless, C.B. testified that between February 19 and March 28, 2021, she saw defendant when he would come into Finish Line. She said he came into the bar about 80% of the nights that she worked. He never came to her house after work during that period of time. She testified that defendant would "text [her] nonsense all the time trying to get [her] to come back to him." She texted defendant on February 22 and 23 to arrange the return of her belongings and told defendant that she was not going to his shop at night because she "didn't want to be around him at night after he had been drinking and doing God knows what." She wanted him to put her belongings outside so she could pick them up without seeing him. He asked her for help with his taxes, and she "told him flat out no." She also told him not to come to Finish Line while she was working.

¶ 21        Defendant sent 22 texts to C.B. between February 26 and 28, 2021, in which defendant professed his love for her, described his suicidal thoughts, apologized for calling her, and referenced the fact that he "just drove by [her] house" and he "know[s] [he has] been replaced." C.B. did not respond to any of those messages.

¶ 22        Defendant sent C.B. 56 text messages between March 1 and March 14, 2021. C.B. responded once on March 5, when defendant asked about a "certificate of insurance," and indicated she sent it to defendant's agent, whom he should call. The next time C.B. responded to defendant's texts was on March 14:

> "[C.B.]: I don't appreciate you waking me up at 3am. Seriously, get your shit together and leave me the f*** alone.
>
> [Defendant]: Ok i figure i was a dead beat bum i will
>
> [Defendant]: Im sry I just had to get out of my soul ill never be good enough for anyone om just a loser and will never have anything cant afford a window so

have worry about a pot to piss in because I don't have a window to throw it out of goodnight

[C.B.]: Yup, leave me alone. On nights I don't have [my son], I can't even have my volume up because you are going to text or call me. LEAVE ME ALONE.

[C.B.]: I want to sleep and here you are bothering me!!! Wow. LEAVE ME ALONE. WE ARE DONE AND OVER. BYE!!"

Defendant texted C.B. again 9 times on March 16, 2021. C.B. responded, "Leave me the f*** alone. Christ! Last warning before I get an order of protection on you're a***."

¶ 23      On March 8, 2021, defendant wrote C.B. a check for $500. Though C.B. initially denied in her testimony that the check was for taxes, the check's memo said, "taxes." On March 16, defendant texted C.B., "Im glad you cashed it's only money I told you that I would help you out."

¶ 24      Defendant texted C.B. three times on March 17, 2021. C.B. responded:

"For f*** sakes, LEAVE ME THE F*** ALONE!!! Once f*** again, I have to turn my phone on silent cause your a*** is going to keep bothering me. F*** ridiculous. I can't even have my volume up on my phone cause of YOU and your psychotic a***. God, I hope there is no emergency with [my son] cause I will miss it all because of YOU and your f*** lack of respect for me and my f*** wishes. Text me anymore, im going to my Livingston County cop friend to get an order of protection. I already talked about it with a chenoa cop, showed him all the proof and the 50 f*** voicemails from you, he told me it would be easy to get."

On March 23, defendant texted C.B. seven times. He told C.B. he left her a tip of $20 "under the ashtray in the backroom." C.B. responded to say the money was not there. On March 25, defendant texted C.B. twice, and she did not respond.

¶ 25　　　　　C.B. provided police with her phone's call log between January 3 and March 23, 2021. C.B. had 26 missed calls from defendant between 1:59 a.m. and 10:09 a.m. on January 3. Between January 5 and February 14, defendant and C.B. talked on the phone many times, with each call lasting less than 10 minutes and most lasting less than 2 minutes. Between February 15 and March 5, defendant called C.B. 26 times, and C.B. did not answer. C.B. called defendant once on March 6 at 6:34 p.m., but defendant did not answer. C.B. testified that she did not pick up defendant's calls because she did not want to talk to him. Defendant left C.B. many voicemail messages, to which she did not respond. C.B. stated that she did not do or say anything to defendant between February 19 and March 28 about the possibility of resuming their relationship.

¶ 26　　　　　　　　　　　5. *The Events of March 27 and 28, 2021*

¶ 27　　　　　C.B. then testified about the events of March 27 and 28, 2021, which were the basis for the charges against defendant. On March 27, C.B. met some friends around 5 p.m. and spent about three hours between three different bars and restaurants before going to Finish Line. She and her friends stayed there for about three hours, doing karaoke and talking. C.B. drank four beers throughout the course of the evening. When she saw defendant at Finish Line around midnight, she decided to leave. She testified that she did not walk past him to leave, did not talk to him, did not text him, and did not tell him he could come over. She returned home, let her dog out, and went to bed. The door to her house was not locked when she got home. She had a Ring security camera installed outside her house, which showed that she arrived at her house at 12:34 a.m.

¶ 28      The Ring camera showed that defendant arrived at C.B.'s house at 1:45 a.m. and parked in her driveway. At 1:46 a.m., he walked into the side door of her house. At 2:58 a.m., the Ring camera showed that her dog was let outside. C.B. testified that when defendant arrived, she was sleeping and was not aware that defendant had entered her house. She was not the one who let her dog out. C.B. stated that she woke up after 2 a.m. to defendant "laying next to [her] trying to stick his hands down [her] pants." She explained that she was lying on her side and he began rubbing himself on her back with his erect penis and kept saying, "I'm sorry, I'm sorry, I'm sorry." At that point, she "rolled over on [her] stomach to protect [her]self and [she] still acted like [she] was sleeping." She then "jumped up out of bed, and [she] just started screaming," saying "[W]hat in the F are you doing here." Defendant apparently said, "[Y]ou brought me here," to which C.B. responded, "[T]hat's not true, you need to get out of my house, you need to leave." After "yelling at him to get out" for what felt like "three to four minutes," defendant said, "I can tell you're mad, I'll let you cool off," then left her bedroom angrily, slammed her door, and went downstairs. She was later asked to demonstrate how much time had passed between her waking up, yelling at defendant, and him leaving her bedroom, and it was approximately 30 seconds.

¶ 29      C.B. then called 911, locked her bedroom door, and loaded her shotgun. She testified that she was not sure what time she called the police, but it might have been around 3 a.m. She acknowledged that there was about an hour-long gap between defendant arriving at her house at 1:45 a.m. and her call to the police at around 3 a.m. but denied having any recollection of what happened until defendant woke her up by entering her bed. She denied having a conversation with him during that time. She said that after she called the police, she waited "25 minutes maybe" for them to arrive. While she was waiting for officers to arrive, she "heard [defendant] outside [her] bedroom door trying to open [her] door again" and heard banging, her doorknob shaking, the door

rattling, and "something *** trying to force [her] door open." She then yelled, "[I]f you set foot in my F'ing bedroom again I'm going to shoot you," and the commotion outside her door stopped. She then opened her bedroom window and "kind of hung halfway out of [her] front window in [her] bedroom" and started yelling, "help, help, help," when she saw a police officer arrive. Police officers then entered her bedroom, unloaded her gun, and talked to her. She testified that at around 3 a.m., she went downstairs and sat with one of the officers at the kitchen table.

¶ 30    According to footage from Corporal Robert King's body-worn camera, officers talked to C.B. in her bedroom at 3:28 a.m. The footage also showed that C.B. denied that defendant had been trying to enter her bedroom again after she told him to leave. A photo taken at 3:27 a.m. showed two cups in the sink, but C.B. denied that they were hers and defendant's; rather, she explained that they were hers and her son's. She testified that her state of mind that night was "[c]loudy" and she "couldn't get [her] thoughts together" because her "anxiety was getting the best of [her]." While the officers were talking with her, she did not "know if [she] was hearing every single word they were saying." She said she remembered the details about defendant rattling her bedroom door "later that morning."

¶ 31    In the afternoon on March 28, 2021, C.B. found a butter knife in her upstairs hallway. She did not move the knife but called the police again, who arrived to take pictures of the knife and collect it. Photos showed the bent knife and damage to C.B.'s bedroom door jamb, which C.B. testified was not there before March 28. King's body-worn camera footage showed the knife in the same place when officers first arrived at around 3 a.m.

¶ 32    On March 30, 2021, C.B. filed a petition for an order of protection against defendant. The trial court granted the motion on April 16, 2021.

¶ 33        On cross-examination, defense counsel referred to C.B.'s prior testimony that she rarely locked the door to her house. C.B. admitted that she remembered telling one of the police officers on March 28, 2021, that she "forgot to lock the door." She denied that this statement meant that she normally locked her door and explained that she was just "embarrassed that [she] didn't lock the doors." Defense counsel referred to several texts between C.B. and defendant. On January 7, 2021, C.B. texted, "I am taking [my son] to bed around 730, if you're not here by then, Ill leave the door unlocked." On January 11, 2021, defendant texted, "Im b there in 15," and C.B. responded, "Lock the door when you get here." However, C.B. testified that (1) she did not only leave her door unlocked for defendant to come over and (2) she did occasionally lock the doors, except when expecting friends. She stated that she was expecting a friend to come over on the night of March 27, so she did not lock her door that night.

¶ 34        C. Testimony of Responding Police Officers and Fingerprint Examiner

¶ 35        Officer Jacob Shepard, a deputy with the McLean County Sheriff's Office at the time of the events of this case, testified that he responded to C.B.'s 911 call on March 28, 2021. His attention was called to C.B.'s residence "by the screaming and crying that [he] could hear," and he subsequently saw "the upper half of a woman's body like hanging out the second story window screaming at [him]." Shepard observed a white Ford F-250 truck in the driveway. When he and two other officers from the Le Roy Police Department entered the residence through the side door, they observed "a skinny white male" in the kitchen wearing socks but no shoes. The officers held him at gunpoint, commanded him to put his hands in the air, and placed him in custody. Shepard observed that the man was swaying side-to-side, omitting "an incredibly strong odor of an alcoholic beverage," and his eyes were "very bloodshot and glassy." Shepard identified defendant as the man he saw in the residence.

¶ 36 Corporal Robert King of the Le Roy Police Department testified that he responded to C.B.'s 911 call on March 28, 2021. He stated that his body-worn camera showed the butter knife in the upstairs hallway that night.

¶ 37 Deputy Aaron King of the McLean County Sheriff's Office testified that he went to C.B.'s residence after March 28, 2021, and collected the butter knife that C.B. found in her hallway. He dusted the knife for fingerprints.

¶ 38 Robert Reneau of the Illinois State Police, a forensic scientist, was certified as an expert in latent fingerprints. He testified that he concluded that one of the two latent fingerprints on the butter knife found in C.B.'s hallway belonged to defendant. He stated that he did not know how long the print was on the knife and that it could have been left if the knife was sitting on the counter and someone placed their hand on it.

¶ 39 Detective Evan Henkel of the McLean County Sheriff's Office testified that C.B. called him to her home on January 13, 2022, to report previous phone harassment by defendant. C.B. provided Henkel with voicemails, missed calls, and text messages from January, February, and March 2021. In the incident report that he prepared on January 14, 2022, Henkel opined that defendant's text about the "rubbers" on January 3, 2021, "give[s] credibility to [C.B.'s] statement that [defendant] was inside her house and went through her belongings" when he entered her house that night. C.B. told Henkel that her relationship with defendant ended on January 1, 2021.

¶ 40 D. Steven Tjarks's Testimony

¶ 41 Steven Tjarks, defendant's friend, testified for the defense. He explained that defendant was a regular customer at Finish Line and that he and defendant would meet up there sometimes. When defense counsel asked Tjarks whether he saw defendant at Finish Line on March 28, 2021, he confirmed that he did. On cross-examination, he likewise testified that it was March

28, 2021, when he was "out with the defendant." He stated that he did not remember what day of the week it was but that he "would say it was a weekend." He did not remember what time he saw defendant at Finish Line. He testified that while he was talking with defendant, he saw a woman come up to defendant and thank him for something. She then said to defendant that "the door would be unlocked for [defendant] to come over." Tjarks observed that the woman "appeared to have been drinking" and that defendant was also intoxicated. Tjarks testified that he had never met or seen the woman before, either alone or with defendant, and did not know her name.

¶ 42          Tjarks testified that he did not see defendant again for another year or year and a half. When he saw defendant again, he asked about defendant's arrest, which led to a discussion of the events of March 28, 2021. The following exchange occurred during cross-examination:

> "[THE STATE]: So when you're having that conversation with [defendant] you ask him about the case that he was arrested on, right?
>
> [TJARKS]: Uh-huh.
>
> Q. And while you were talking to [defendant] on that day he told you that it was the girl from the Finish Line, didn't he?
>
> A. Oh, I assume so, yeah, that it was the same situation.
>
> Q. Because he told you that it was, correct?
>
> A. Well, I don't remember how the conversation went."

He later confirmed that defendant "could have" told him that it was the same woman.

¶ 43          Tjarks testified that shortly after their meeting, he was contacted by an investigator, who asked if he could identify the woman who had spoken to defendant at Finish Line that night. The investigator sent Tjarks a photo of C.B., and Tjarks confirmed she was the woman who he had seen talking to defendant at Finish Line on March 28, 2021. The only photos that the

investigator sent to Tjarks were of C.B.; he was not shown a photo lineup with several different women and asked to choose between them. A few days after that, Detective Henkel called Tjarks to discuss the case. Tjarks testified that he told Henkel that he had never seen the woman before and that he "probably" told Henkel during that conversation that he would not have recognized that woman if he saw her again after that night.

¶ 44                                E. Jury Instructions and Deliberations

¶ 45            The parties presented their closing arguments beginning at 1:30 p.m. on January 18, 2024. Afterwards, the trial court instructed the jury, "The fact that the defendant did not testify must not be considered by you in any way in arriving at your verdict," mirroring Illinois Pattern Jury Instructions, Criminal, No. 2.04 (approved Dec. 8, 2011) (hereinafter IPI Criminal No. 2.04), as defense counsel requested. The jury deliberated until 5 p.m. on January 18 and resumed their deliberations in the morning on January 19. At 1:22 p.m. on January 19, the court received a note from the jury, asking, "What constitutes reasonable doubt?" The parties agreed to respond, "[I]t is for the jury to decide what constitutes a reasonable doubt. You have been given the instructions on the law in this case, and should rely on those instructions." Shortly before 3:30 p.m., the jury returned a verdict of guilty on both counts.

¶ 46                                F. Posttrial Proceedings

¶ 47            On February 6, 2024, defendant filed a motion for judgment notwithstanding the verdict. At a hearing on March 27, the trial court denied defendant's motion and subsequently sentenced defendant to eight years in the Illinois Department of Corrections. Defendant filed a motion to reconsider his sentence, which the court denied on June 26, 2024.

¶ 48            This appeal followed.

¶ 49                                          II. ANALYSIS

¶ 50        On appeal, defendant argues that (1) the trial court erred in admonishing potential jurors under Illinois Supreme Court Rule 431(b) (eff. July 1, 2012) when it improperly phrased the fourth principle enumerated in that rule and (2) alternatively, his trial counsel was ineffective to the extent that she acquiesced in the court's failure to strictly comply with Rule 431(b). Defendant acknowledges that he failed to preserve this issue for appeal through a timely objection or posttrial motion but contends that this court may consider his claim under plain-error review. In turn, the State argues that no error occurred—or alternatively, that any error was cured—because shortly after the court's statements, defense counsel repeated all four Rule 431(b) principles using the proper language.

¶ 51        Defendant admits he did not preserve this issue for appeal but contends that we may review it under the first prong of the plain-error doctrine. See *People v. Birge*, 2021 IL 125644, ¶ 23. An unpreserved error may be considered on appeal under the plain-error doctrine if (1) "a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error," or (2) "a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *Birge*, 2021 IL 125644, ¶ 24. The defendant bears the burden of persuasion under both prongs. *Birge*, 2021 IL 125644, ¶ 24. However, the Illinois Supreme Court has held that a "Rule 431(b) violation is not cognizable under the second prong of the plain error doctrine, absent evidence that the violation produced a biased jury." *People v. Sebby*, 2017 IL 119445, ¶ 52. The first step under the plain-error doctrine is determining whether a clear or obvious

error occurred. *Birge*, 2021 IL 125644, ¶ 24. We review the trial court's compliance with Rule 431(b) *de novo. People v. Thompson*, 238 Ill. 2d 598, 606 (2010).

¶ 52        Rule 431(b) was adopted to ensure compliance with the requirements of *Zehr*. See Ill. S. Ct. R. 431(b), Committee Comments (rev. July 1, 2012). The rule establishes:

> "The court shall ask each potential juror, individually or in a group, whether that juror understands and accepts the following principles: (1) that the defendant is presumed innocent of the charge(s) against him or her; (2) that before a defendant can be convicted the State must prove the defendant guilty beyond a reasonable doubt; (3) that the defendant is not required to offer any evidence on his or her own behalf; and (4) that if a defendant does not testify it cannot be held against him or her." Ill. S. Ct. R. 431(b) (eff. July 1, 2012).

¶ 53        The supreme court has stringently applied Rule 431(b), finding that the rule "mandates a specific question and response process." *Thompson*, 238 Ill. 2d at 607. In *People v. Wilmington*, 2013 IL 112938, ¶ 28, the trial court asked prospective jurors whether they "disagree[d]" with the *Zehr* principles, as opposed to whether they understood and accepted them. The supreme court held that was insufficient under Rule 431(b) and noted, "While it may be arguable that the court's asking for disagreement, and getting none, is equivalent to juror *acceptance* of the principles, the trial court's failure to ask jurors if they *understood* the four Rule 431(b) principles is error in and of itself." (Emphases in original). *Wilmington*, 2013 IL 112938, ¶ 32; see *Thompson*, 238 Ill. 2d at 607 (finding a clear violation of Rule 431(b) where the trial court asked potential jurors if they understood, but not if they accepted, the presumption of innocence). More recently, the supreme court found a clear error where the court asked prospective jurors "whether they 'had any problems with' or 'believed in' [the *Zehr*] principles" rather than

whether they "understood" and "accepted" them. *Sebby*, 2017 IL 119445, ¶ 49. Though *Wilmington* suggested that asking whether jurors disagreed with the *Zehr* principles may be acceptably equivalent to asking whether prospective jurors accepted them, *Sebby* suggests that Rule 431(b) mandates the trial court to ask, verbatim, whether the jurors both "understand" and "accept" each of the four principles. The supreme court thus seems to have singled out Rule 431(b) to require stricter compliance than other rules. See, *e.g.*, *People v. Brown*, 2023 IL App (3d) 210181, ¶ 51 (holding substantial compliance with Illinois Supreme Court Rule 401(a) (eff. July 1, 1984), addressing admonishments about waiver of counsel, is sufficient); *People v. Dominguez*, 2012 IL 111336, ¶¶ 15-19 (discussing that the language of Illinois Supreme Court Rule 605(c) (eff. Oct. 1, 2001) requiring the court to "advise the defendant *substantially* as follows" requires imparting only the rule's essence, not reading it verbatim (emphasis in original)); *People v. Newman*, 365 Ill. App. 3d 285, 288 (2006) ("Substantial compliance with [Illinois Supreme Court] Rule 402 [(eff. July 1, 1997)] [addressing admonishments before accepting a guilty plea] is sufficient to establish due process.").

¶ 54        Though the supreme court has addressed verbatim questioning under Rule 431(b), it has not yet addressed whether the principles themselves must be read verbatim. Appellate courts appear to be split on this issue. See *People v. Kidd*, 2014 IL App (1st) 112854, ¶ 38 (holding that the statement that " '[t]he defendant is not required to prove his [*sic*] innocence' " sufficiently conveyed the third principle that "the defendant was not obligated to present evidence on her behalf"); *People v. Atherton*, 406 Ill. App. 3d 598, 611 (2d Dist. 2010) (holding that the instruction that the " 'defendant does not have the burden of proving himself innocent' " sufficiently conveyed the third principle); *People v. Chester*, 409 Ill. App. 3d 442, 447 (4th Dist. 2011) ("Rule 431(b) does not require the court to recite the principles verbatim," and the trial court's "statement that

'defendant is not required to prove his innocence' would be interpreted by a reasonable jury" to convey the third principle because "if defendant is not required to prove his innocence, he has no reason to present evidence."); but see *People v. Raymond*, 404 Ill. App. 3d 1028, 1055 (1st Dist. 2010) ("[T]here is a difference between stating that a defendant is not required to *prove* his innocence—indicating that the burden of proof is on the State—and explaining that defendant was not required to produce *any* evidence." (Emphases in original.)); *People v. McGuire*, 2017 IL App (4th) 150695, ¶¶ 32, 35 (noting that "courts must exercise diligence when instructing the jury of the *Zehr* principles as codified in Rule 431(b) and must not deviate in any way from the precise language chosen by the Illinois Supreme Court to be in that rule" but ultimately finding that the defendant was barred from challenging the Rule 431(b) admonishments under the invited-error doctrine).

¶ 55 The supreme court has, however, expressly addressed the precise wording of the fourth *Zehr* principle through the rulemaking process. Under the prior version of Rule 431(b), the fourth principle read: "the defendant's failure to testify cannot be held against him or her." Ill. S. Ct. R. 431(b) (eff. May 1, 2007). On April 26, 2012, the supreme court amended this rule to its current language: "if a defendant does not testify it cannot be held against him or her." Ill. S. Ct. R. 431(b) (eff. July 1, 2012). With supreme court rules, as with statutes, "[i]t is presumed that every amendment *** is made for some purpose, and effect must be given to the amended law in a manner consistent with the amendment." (Internal quotation marks omitted.) *People v. Burge*, 2021 IL 125642, ¶ 33; see *Thompson*, 238 Ill. 2d at 606 ("The interpretation of this court's rules is controlled by the same principles applicable to the construction of statutes."). The only change the supreme court made to Rule 431(b) that year was to remove the word "failure" and restructure

the sentence correspondingly. Thus, we must presume that the supreme court made this change intentionally.

¶ 56    With these principles in mind, the trial court's use of the 2007 version of Rule 431(b)—"failure to testify"—constitutes clear and obvious error. The court was required to apply the current version of the rule using the amended language. See *People v. Hammonds*, 409 Ill. App. 3d 838, 858 (2011) ("There is no question that, in the case at bar, the trial court erred. The 2007 version applied to the case at bar, and the trial court failed to implement the changed version."). If the supreme court believed the language was interchangeable, it would not have amended the rule specifically to replace those three words. This finding is also in accordance with this court's decision in *People v. Neal*, 2020 IL App (4th) 170869, ¶¶ 172, 174, where we accepted the State's concession of error in instructing potential jurors using the preamendment language, " 'failure to testify.' "; but see *Beacham v. Walker*, 231 Ill. 2d 51, 60 (2008) (stating a reviewing court is not bound by a party's concession of error).

¶ 57    The State argues that any error made by the trial court was cured by defense counsel's restatement of the correct principle soon thereafter. Yet the State concedes that a violation of Rule 431(b) during *voir dire* cannot later be cured by using a proper instruction, such as IPI Criminal No. 2.04, prior to jury deliberations. *Sebby*, 2017 IL 119445, ¶¶ 73-77. Likewise, this court has found that defense counsel cannot cure the court's error by properly reciting a *Zehr* principle during *voir dire*, as "the court itself is required to address this principle." *Chester*, 409 Ill. App. 3d at 447. Thus, any error could not have been cured by defense counsel's restatement of the fourth *Zehr* principle during *voir dire* or by the posttrial instruction given to the jury.

¶ 58    Though defendant argues that the use of the word "failure" had negative and prejudicial connotations, we need not address whether defendant was prejudiced in this exact way.

The core of first-prong-plain-error jurisprudence dictates that "whether a Rule 431(b) violation is trivial or *de minimis*—and we have repeatedly stated that it is neither—is simply the wrong inquiry," as "prejudice rests not upon the seriousness of the error but upon the closeness of the evidence." *Sebby*, 2017 IL 119445, ¶¶ 68-69.

¶ 59 Having determined that a clear and obvious error occurred, defendant is entitled to a new trial if the evidence at trial was closely balanced. In determining whether the evidence is closely balanced, "a reviewing court must make a commonsense assessment of the evidence within the context of the circumstances of the individual case." *People v. Belknap*, 2014 IL 117094, ¶ 52. This analysis "does not involve the sufficiency of close evidence but rather the closeness of sufficient evidence." *Sebby*, 2017 IL 119445, ¶ 60. "For purposes of plain-error analysis, 'closely balanced' means that the key testimony is uncorroborated by extrinsic evidence and the testimony presents a choice between competing and plausible accounts." *People v. Saulsberry*, 2021 IL App (2d) 181027, ¶ 103.

¶ 60 Several facts lead us to conclude that the evidence in this case was closely balanced. The case hinged on the credibility of C.B.'s testimony that defendant entered her home without authority and rubbed her back through her clothes with his penis while she slept. Defendant relied on the testimony of Tjarks to show that C.B. invited defendant over to her house on the night in question, thus generally undermining C.B.'s allegations. There were only a few pieces of nontestimonial evidence—the front door being unlocked, the photos from C.B.'s Ring camera, the photo of two cups in the sink, the bent butter knife with defendant's fingerprints—and they did not directly corroborate or conflict with either C.B.'s or Tjarks's testimony. C.B.'s front door was unlocked that night; however, it was unclear from her testimony whether she routinely left it unlocked or left it unlocked only when she was expecting defendant or a different friend to come

- 21 -

over. Either way, the fact that the door was unlocked that night does not conclusively support either account. The hour-long gap between defendant's arrival at C.B.'s house and C.B.'s call to the police, as well as the photo of the two cups in the sink, could or could not imply that C.B. and defendant had a conversation during that time. The bent butter knife with defendant's fingerprints seems to corroborate C.B.'s account of defendant's attempt to unlock her bedroom door after she told him to leave (and after the events giving rise to the charges) but is ultimately not conclusive of whether he was invited to her house that night in the first place or whether he sexually assaulted her.

¶ 61          As there was no conclusive nontestimonial evidence presented at trial, the case hinged entirely on a credibility contest between C.B. and Tjarks. C.B.'s testimony and text messages showed that she "tried" to break up with defendant at least four times but reinitiated the relationship repeatedly. Each time after she attempted to end the relationship, she texted defendant to leave her alone and even threatened, on January 28, 2021, to "go to the cops." However, just a few days later, she invited defendant to come to her house again. Though she testified that the relationship was "done-done" after February 19, 2021—and the texts and call logs confirm that she did not reply to any of defendant's calls or most of his texts after that date—there was no nontestimonial evidence that directly contradicted Tjarks's testimony that C.B. invited defendant to her house on March 27, 2021, when she saw him at Finish Line that night.

¶ 62          Tjarks's testimony certainly presented credibility issues, as (1) his comment to Henkel that he probably would not have recognized C.B. after that night seems to undermine his ability to identify C.B. in a photo, (2) he testified that he saw defendant on March 28, though the events at issue in this case occurred on March 27, and (3) his identification of C.B. as the woman at the bar is less reliable given that defendant likely told him that the woman he saw in the bar that

- 22 -

night was the same as the one involved in the criminal case. However, his account was still plausible, and it is for a jury, not this court, to make credibility determinations about the key disputed issue in a criminal case.

¶ 63     Overall, the key testimony was uncorroborated by nontestimonial evidence and presented a choice between C.B.'s and Tjarks's competing and plausible versions of events. See *Saulsberry*, 2021 IL App (2d) 181027, ¶ 103. Because the outcome of the case depended on a credibility contest between C.B. and Tjarks, the evidence presented at trial was closely balanced.

¶ 64     The length of jury deliberations supports this conclusion. We acknowledge that the length of jury deliberations "is not always an accurate indicator of whether the evidence was closely balanced." *People v. Walker*, 211 Ill. 2d 317, 342 (2004); see *Wilmington*, 2013 IL 112938, ¶ 35 ("[A]lthough the jury sent notes to the judge during the deliberative process, there is no indication in the record that the jury at any time had reached an impasse or that the jurors themselves considered this a close case."). However, "in certain cases, a lengthy deliberation accompanied by a note from the jury demonstrates the closeness of the evidence." *People v. Scott*, 2015 IL App (4th) 130222, ¶ 37 (finding the lengthy deliberation and notes from the jury were inconsequential where the evidence against the defendant was overwhelming). Here, it was not a particularly lengthy trial necessitating intense deliberations. See *People v. Bliefnick*, 2024 IL App (4th) 230707, ¶ 280 ("[F]ive hours of deliberations following a week-long murder trial is hardly unexpected."). Yet the jury began their deliberations in the afternoon of January 18, 2024, and did not deliver their verdict until around 3:30 p.m. on January 19. After deliberating for several hours, the jury sent a note to the trial court at 1:30 p.m. on January 19, 2024, asking about the definition of reasonable doubt. The evidence against defendant was certainly not overwhelming. Moreover, the jury note suggests that jurors were uncertain about how confident they had to be to convict

defendant. The length of deliberations and the jury note thus support an inference that the jurors themselves believed the evidence to be close.

¶ 65    Because defendant has demonstrated that there was a clear and obvious error in the trial court's Rule 431(b) admonishments and that the evidence was closely balanced, defendant is entitled to relief under the first prong of the plain-error doctrine. Under these circumstances, it is possible that the trial court's failure to comply with Rule 431(b) tipped the scales and prejudiced defendant. See *Sebby*, 2017 IL 119445, ¶ 78 ("It is not inevitable that a jury who receives faulty instructions on the *Zehr* principles is biased [citations], but it is possible. And if it is possible, it is also possible that those faulty instructions contributed to the result.").

¶ 66    Trial courts must exercise diligence when admonishing potential jurors under Rule 431(b), especially in those cases involving charges and rights as serious as those at issue here. The easiest way to ensure compliance with the rule is to recite the precise language chosen by the Illinois Supreme Court. See *Neal*, 2020 IL App (4th) 170869, ¶¶ 188-89 (acknowledging that "[b]eing a trial judge can be a difficult job, often requiring careful study to properly apply difficult legal concepts and to ensure that a jury is properly instructed on the law" but emphasizing that "there is no excuse for a trial judge to not strictly comply with the clear and explicit directions the supreme court has provided for trial courts when admonishing prospective jurors"). Likewise, both defense counsel and prosecutors must be aware of the strict requirements of Rule 431(b) so that they can object to any improper deviation from the rule and allow the court to immediately rectify the error.

¶ 67    For the reasons stated, we reverse defendant's convictions and remand for a new trial. As a result, we need not address defendant's alternate argument that his trial counsel was ineffective. While we reverse defendant's convictions, we find the evidence was sufficient to prove

defendant guilty beyond a reasonable doubt. The jury was tasked with making a credibility determination between C.B. and Tjarks and ultimately gave more credence to C.B.'s testimony. Thus, we find there is no double jeopardy impediment to a new trial. However, we reach no conclusion regarding defendant's guilt that would be binding on retrial. See *People v. Naylor*, 229 Ill. 2d 584, 611 (2008).

¶ 68                                    III. CONCLUSION

¶ 69        For the reasons stated, we reverse the trial court's judgment and remand for further proceedings.

¶ 70        Reversed and remanded.